

**FILED**

Sep 09 2015, 8:46 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

David W. Stone, IV
Stone Law Office & Legal Research
Anderson, Indiana

Todd A. Glickfield
Marion, Indiana

Josef D. Musser
Spitzer Herriman Stephenson Holderman
Musser & Conner, LLP
Marion, Indiana

Michelle Cobourn-Baurley
McNeely Stephension Thopy & Harold
Shelbyville, Indiana

ATTORNEYS FOR APPELLEE

Nelson D. Alexander
Kevin C. Schiferl
Blake N. Shelby
Frost Brown Todd, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kolby O'Banion, Taylor O'Banion, Tim O'Banion & Kelly O'Banion,

Michael R. Roush, as Executor of the Estate of Karen L. Roush, Deceased,

Indiana Farm Bureau Insurance Co. as Subrogee of Karen Roush, Deceased,

September 9, 2015

Court of Appeals Cause No. 27A04-1411-PL-531

Appeal from the Grant Superior Court

The Honorable Jeffrey D. Todd, Judge

Trial Court Cause No.
27D01-1010-PL-946
formerly 27D01-1107-CT-774
formerly 27D01-1107-CT-779

*Appellants-Plaintiffs,*

v.

Ford Motor Company,
*Appellee-Defendant.*

**Barnes, Judge.**

# Case Summary

Kolby, Taylor, Tim, and Kelly O'Banion ("the O'Banions"), Michael Roush as Executor of the Estate of Karen Roush ("the Estate"), and Indiana Farm Bureau Insurance Company ("Farm Bureau") (collectively "the Appellants") appeal the trial court's grant of summary judgment in favor of Ford Motor Company ("Ford"). We reverse and remand.

# Issues

The Appellants raise three issues, which we consolidate and restate as:

I.   whether the trial court erred in excluding the testimony of David Zedonis; and

II.  whether the trial court erred in excluding the testimony of William Berg.

## Facts

As background information, it is necessary to understand a car's throttle assembly. There are five main parts of an assembly: the accelerator pedal, the throttle cable, a protective sheath through which parts of the cable run, a ferrule to bind the cable, and the throttle plate. The throttle cable itself is made of seven ropes, which are each made up of seven wires, meaning the throttle cable consists of forty-nine wires. As a driver applies pressure to the accelerator pedal, the throttle cable transmits force that causes the throttle plate to open. Full pressure on the pedal should cause the throttle plate to be "wide open," and releasing pressure should cause the throttle plate to close and return the engine to idle.

On July 29, 2009, Karen was driving southbound on State Road 37 in a 2005 Mercury Monterey. That road intersects with 26th Street in Marion at an intersection controlled by a traffic light. As she approached that intersection, the light in her direction was red. Kolby and Taylor were stopped in the northbound lane of traffic on State Road 37. Instead of stopping at the red light, Karen accelerated through the intersection, struck Kolby and Taylor's car, then left the roadway and struck a light pole. Karen was killed in the accident, and Kolby and Taylor were severely injured.

On October 19, 2010, Farm Bureau, as subrogee of Karen, filed suit against Ford to recover proceeds it had paid for damages to the Monterey. Farm Bureau alleged that the accident had been caused by a defective throttle assembly that caused the Monterey to accelerate uncontrollably through the

intersection. On July 20, 2011, the Estate filed a wrongful death action against Ford, making the same allegations regarding the throttle assembly. On July 26, 2011, the O'Banions (brothers Kolby and Taylor and their parents Tim and Kelly) filed a third suit against Ford, as well as the Estate. The trial court consolidated all three cases for purposes of pretrial proceedings and trial.

[6]     The trial court adopted a case management plan for the combined cases that required the Appellants to disclose any expert witnesses to Ford no later than September 1, 2013. Any discovery related to expert witnesses was to be completed by December 31, 2013. Trial originally was set for April 7, 2014. It later was continued to October 20, 2014, with the trial court indicating that no further continuances would be granted in the absence of an emergency of some type.

[7]     On June 19, 2012, Farm Bureau disclosed that it intended to rely upon the testimony of mechanical engineer David Zedonis and a report he had prepared on September 16, 2010, regarding the throttle of the Monterey having allegedly malfunctioned. On January 15, 2013, the Estate disclosed that it intended to rely upon both Zedonis and William Berg, Ph.D., another mechanical engineer. On September 3, 2013, Farm Bureau and the Estate filed a joint disclosure that they both intended to rely upon the expert testimony of Zedonis and Berg and reports they had prepared. The O'Banions did not file a separate expert witness disclosure list; on August 7, 2014, they filed a final witness list indicating that they would rely upon witnesses called by either Ford or the Estate.

[8] On August 29, 2013, Zedonis wrote an updated report, based on additional examinations of the vehicle and other discovery. In the updated report, Zedonis opined among other things that the throttle cable had become stuck within the sheath and, "The worn and fraying condition of the throttle cable on the Roush's 2005 Mercury Monterey represented an unreasonably dangerous vehicle defect for Mrs. Roush." App. p. 105. Zedonis's report also stated that other Ford vehicles from this time period were reported to have similar throttle issues but that Ford had taken little action in response to such reports. The report also noted, "The specific cause of the heavily worn throttle wear has not been specifically determined as of yet." *Id.* at 113.

[9] On October 9, 2013, Ford deposed Zedonis regarding the opinions expressed in his 2010 and 2013 reports. During the deposition, Zedonis stated that the throttle cable on Roush's vehicle had fractured "near the nose tip of the throttle sheath and ferrule in the engine compartment." *Id.* at 118. Counsel for Ford asked Zedonis whether he had measured the actual throttle cable, and he said he had not. Zedonis also stated, in response to questioning, that he could not specifically state where the throttle cable had stuck inside of the sheath, but he opined that the accident occurred when the throttle was at the wide open position.

[10] Counsel for Ford also had the following exchanges with Zedonis:

> Q: It's very simple. If the fracture is not at a location where the throttle would be held open at or near wide open throttle, then your opinion that the cable bound at that location is inconsistent with the physical evidence; correct?

A:      I mean, I would consider all that to assess what you're asking me the question to, but I—you know, right now, I see wear and fraying, and your discovery materials show wear and fraying can cause sticking throttles, as well as all the recalls.  To me it's let's look at the most obvious situation here.

Q:      Now, why is her not applying the wrong pedal a most obvious situation?

A:      I mean, I can't exclude that.

Q:      You can't exclude it.

A:      No.

* * * * *

Q:      And if it occurred at a location where the throttle plate would have been open less than [wide open throttle], which is what you've already told us that the accident took place at, then your theory that it bound at [wide open throttle] is not correct; right?

A:      Again, you know, if we do additional work, we may draw that conclusion.  But, you know, right here, as I sit here today, we've talked about a lot of things, you've given me some items to think about, and I'm not going to—I mean, my opinions are still the way they are today, as we sit here without doing any further work.

* * * * *

Q:      Your hypothesis that you haven't tested is that it would bind inside the sheath; correct?

A:      Yes.

Q:      And your hypothesis that you haven't tested yet is that it would bind somewhere in the ferrule; correct?

A.      Yes.

* * * * *

Q:      And so now you're thinking that it may have bound up there?  You haven't taken any issue with the Teflon sheath, have you?

A:      No.  Not that I know of.  I mean, to me it's one of those things where, you know, if we can actually cut this thing apart and actually look at it carefully and cut other parts, then we can try to ascertain exactly what the problem was.  But right now I've got excessive wear

and—so I—I mean, that's—and fraying, to me, it's pretty simple. It wore a fray.

And the other things is, I mean, we already covered this a little bit, is the wear area on the cable itself would be a transitioning portion of the cable that moved relative to the ferrule and the wiper; and so, therefore, what you have is, you know, that stuff would be then, under a wide open throttle scenario, would be basically translated into the cable itself—

Q: You haven't measured the cable.

A: —into the core.

Q: You haven't measured the cable; right?

A: I have not.

*Id.* at 120, 121-22, 124, 125-26.

[11] On August 13, 2013, Berg filed a report addressing the "engineering and human factors" connected with the accident. *Id.* at 84. Berg's report relied upon Zedonis's conclusion that Roush's vehicle "had a throttle cable defect that precipitated the sudden/unwanted acceleration incident. Given the presence of that vehicle condition, the subsequent guidance and control actions exhibited by Ms. Roush were analyzed using engineering and human factors fundamentals and methods of analysis." *Id.* at 88. Berg ultimately concluded:

> [T]here is no basis to conclude that Ms. Roush committed a pedal error, nor is there any basis to conclude that she did not respond to the situation involving the sudden/unwanted acceleration of her vehicle in a confined area in a manner that would be reasonably predictable based on typical driver knowledge and normal patterns of driver behavior.

*Id.*

[12]     On December 27, 2013, Ford filed a motion for summary judgment and a motion to exclude any testimony by Zedonis. Specifically, Ford asserted that "Zedonis' opinions regarding the Monterey's allegedly defective throttle lack any viable engineering foundation and, thus, amount to pure speculation and conjecture." *Id.* at 94. It also claimed Zedonis was "unable to distinguish in any legitimate engineering fashion whether the fray he found was 'the cause' as opposed to 'the result' of the collision. Further, Zedonis admits that the fractured cable was due to the force of the collision and not any defect." *Id.*

[13]     In response to Ford's motion for summary judgment and motion to exclude Zedonis's testimony, Zedonis filed an affidavit in which he stated:

> It is my opinion, to a reasonable degree of engineering certainty, the cause of the accident was a stuck throttle cable with excessive wear failure in the stainless steel throttle cable rope that, in turn, resulted in some of the cable strands becoming disturbed and binding inside the cable assembly, preventing the throttle from returning to idle. I base this opinion upon my inspection of the subject vehicle, my examination of an exemplar vehicle, microscopic and x-ray analysis of the subject throttle cable and sheath, review of the materials produced by Ford in discovery, including a number of vehicle recalls, plus my extensive training and experience as a mechanical engineer and accident reconstructionist.

*Id.* at 171. Zedonis also stated, "There can be no dispute that the throttle cable . . . shows signs of extensive wear, more extensive than one would anticipate in a car with 68,417 miles on the odometer." *Id.* He asserted that his analysis did not depend upon pinpointing the exact cause of the fraying of the throttle cable and that it was clear from the evidence that the fray was not caused by the collision but pre-existed it. He further stated that the measurement of the

throttle cable was irrelevant to his findings of excessive wear. Ford moved to strike Zedonis's affidavit, claiming it stated new opinions and facts not related in his earlier reports and deposition.

[14] On May 8, 2014, the trial court denied Ford's motion for summary judgment and motion to exclude Zedonis's testimony; it also denied Ford's motion to strike Zedonis's affidavit. On July 24, 2014, Ford renewed its motion to exclude Zedonis's testimony and moved to exclude Berg's testimony as well. This motion originally did not assert any new grounds for excluding Zedonis's testimony. As for Berg, Ford asserted that he was unqualified to offer opinions on the mechanical or electrical functioning of an automobile, and that "his reliance on Zedonis' inadmissible opinions renders his opinions inadmissible." *Id.* at 463.

[15] On September 4, 2014, Ford redeposed Zedonis. At that time, Zedonis revealed that he had been asked by the Estate's attorney to conduct additional testing. During this deposition, Zedonis stated that he had now measured the throttle cable after it had been sealed in an evidence bag. He also had continued taking photographs up until the morning of the deposition. Zedonis stated, in response to questioning from Ford, that experiments conducted by him failed to cause a throttle cable to bind and that there was "no physical evidence" for his hypothesis that cable strands had become disturbed and bound inside of the throttle cable assembly. *Id.* at 490.

[16] On September 15, 2014, Ford filed a supplement to its motion to exclude Zedonis's testimony, based on his continuing to conduct tests after the previous deposition and affidavit and after the case management plan's discovery deadline.[1] In response to Ford's motion to exclude, the Estate filed an affidavit from Berg stating in part:

> Contrary to Ford's assertion, I do not purport to opine that the subject accident was caused by a stuck throttle cable. As I understand it, that analysis will be offered by plaintiff's mechanical expert. What I have done, however, is to analyze the guidance and control actions exhibited by Mrs. Roush assuming the vehicle malfunctioned in that manner. Applying the principles of engineering and human factors, I found that there is no basis to conclude that Mrs. Roush committed a pedal error or that she did not respond in a way that was reasonably predictable based on typical driver knowledge and normal patterns of driver behavior.

Appellee's App. p. 172.[2]

[17] On September 29, 2014, the trial court entered an order excluding all testimony of Zedonis and Berg. Ford thereafter renewed its motion for summary judgment. The trial court granted summary judgment to Ford. The Appellants now appeal.

---

[1] With this supplement, Ford provided the trial court with limited excerpts from Zedonis's most recent deposition. On appeal, Ford has included the entire deposition in its appendix without indicating that it was ever filed with the trial court. We limit our consideration on appeal to the pages of the deposition Ford provided to the trial court.

[2] We have granted Ford's motion to strike a different, unfiled version of Berg's affidavit from the Appellants' Appendix, as well as portions of the Appellants' Brief referring to the unfiled affidavit. Ford provided the actual, filed affidavit in its appendix, and that is the version we quote here.

## Analysis

[18] We first address Ford's assertion that the O'Banions lack standing to challenge the trial court's ruling excluding the testimony of Zedonis and Berg because they did not disclose them as expert witnesses upon whom they intended to rely at trial until well after the trial court's deadline for disclosing such witnesses. In order to have standing to pursue an appeal of an order, a party must have a "'sufficient stake in an otherwise justiciable controversy.'" *Simon v. Simon*, 957 N.E.2d 980, 987 (Ind. Ct. App. 2007) (quoting *Indiana Civil Rights Comm'n v. Indianapolis Newspapers, Inc.*, 716 N.E.2d 943, 945 (Ind. 1999)). The point of the standing requirement is "to insure that the party before the court has a substantive right to enforce the claim that is being made in the litigation." *Id.* "In order to have standing, the challenging party must show adequate injury or the immediate danger of sustaining some injury." *Id.*

[19] We are hard-pressed to discern why we should issue a ruling that the O'Banions lack standing in this appeal. They have joined a brief also signed onto by Farm Bureau and the Estate, and Ford makes no argument that Farm Bureau or the Estate lack standing. The O'Banions likewise are necessarily parties in this appeal under Indiana Appellate Rule 17(A) because they were parties of record below. To hold that the O'Banions had no standing in this appeal would have no practical effect on its outcome.

[20] Additionally, we note that our supreme court has held that pretrial disclosure of witnesses fulfills the purpose of providing all parties "'with information

essential to the litigation of all relevant issues, to eliminate surprise, and to promote settlement with a minimum of court involvement.'" *McCullough v. Archbold Ladder Co.*, 605 N.E.2d 175, 179 (Ind. 1993) (quoting *Canfield v. Sandock*, 563 N.E.2d 526, 528 (Ind. 1990)). Ford is making no argument that the trial court should have excluded the O'Banions from relying on Zedonis and Berg at trial, aside from the general reasons applicable to all of the Appellants. Ford fails to explain how it would be unfairly prejudiced by the O'Banions relying on the experts, where it has been fully aware of the existence of Zedonis and Berg and their opinions for some time and the O'Banions' case has been fully consolidated with those of Farm Bureau and the Estate. And, although it is true that the O'Banions must separately prove their case against Ford, the evidence related to whether the crash resulted from a manufacturing defect would be identical to the evidence presented by Farm Bureau and the Estate. With that said, we address the merits of the Appellants' claims.

## I. Zedonis's Testimony

### A. Admissibility under Indiana Evidence Rule 702

[21] We first address the admissibility of Zedonis's testimony, as the admissibility of Berg's testimony is largely contingent upon that issue. Indiana Evidence Rule 702 provides:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

> (b) Expert scientific testimony is admissible only if the court is satisfied
> that the expert testimony rests upon reliable scientific principles.

Trial courts are the gatekeepers for expert opinion evidence. *Akey v. Parkview Hosp. Inc.*, 941 N.E.2d 540, 543 (Ind. Ct. App. 2011), *trans. denied*. We will reverse a trial court's decision regarding the admissibility of expert testimony only if it is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

[22]    This case concerns the admissibility of a mechanical engineer's testimony. The "specialized knowledge" referred to in Evidence Rule 702(a) includes more than just scientific knowledge, and expert testimony other than scientific testimony need not be proven reliable by means of "scientific principles." *Lyons v. State*, 976 N.E.2d 137, 142 (Ind. Ct. App. 2012) (citing *Malinski v. State*, 794 N.E.2d 1071, 1084 (Ind. 2003)). "Rather, such evidence is governed only by the requirements of Rule 702(a), and any weaknesses or problems in the testimony go only to the weight of the testimony, not to its admissibility, and should be exposed through cross-examination and the presentation of contrary evidence." *Id.* (citing *Turner v. State*, 953 N.E.2d 1039, 1050 (Ind. 2011)).

[23]    This court has specifically held that mechanical engineering is specialized or technical knowledge, not scientific knowledge subject to the limits of Evidence Rule 702(b). *Fueger v. Case Corp.*, 886 N.E.2d 102, 106-07 (Ind. Ct. App. 2008), *trans. denied*. We explained in *Fueger*:

> Where an expert's testimony is based upon the expert's skill or experience rather than on the application of scientific principles, the proponent of the testimony must only demonstrate that the subject matter is related to some field beyond the knowledge of lay persons and the witness possesses sufficient skill, knowledge or experience in the field to assist the trier of fact to understand the evidence or to determine a fact in issue.

*Id.* at 105.

[24] We acknowledge that other cases have seemed to assume that mechanical engineering is a scientific discipline for purposes of Evidence Rule 702. *See, e.g.,* *WESCO Distrib., Inc. v. ArcelorMittal Indiana Harbor LLC*, 23 N.E.3d 682, 696, 699 (Ind. Ct. App. 2014), *trans. dismissed.* Even where scientific testimony is concerned, Evidence Rule 702 is not intended "to interpose an unnecessarily burdensome procedure or methodology for trial courts." *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 460 (Ind. 2001). Although the rule authorizes the exclusion of purported scientific evidence if the trial court finds that it is based on unreliable principles, the adoption of the rule was intended "to liberalize, rather than to constrict, the admission of reliable scientific evidence." *Id.*

> Once the trial court is satisfied that the expert's testimony will assist the trier of fact and that the expert's general methodology is based on reliable scientific principles, then the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact.

*Id.* at 461.

[25] Here, there is no claim or argument by Ford that Zedonis lacked the necessary engineering qualifications to analyze and offer opinions regarding the throttle

mechanism of Karen Roush's Mercury Monterey. Instead, Ford takes issue with various particulars of Zedonis's analysis and his ultimate opinion that the throttle cable inside the vehicle had excessive wear, leading to some of the strands that made up the cable binding inside of the cable assembly and preventing the throttle from returning to idle—thus leading to the crash when Karen drove through an intersection at high speed. Zedonis explained that he reached this hypothesis about the throttle cable based on examination of an exemplar vehicle, microscopic and x-ray examination of the Monterey's throttle cable and surrounding sheath, review of documentary materials related to throttle cables and recalls of them, and his training and experience as a mechanical engineer and accident reconstructionist.

[26]     Ford points to what it asserts are two primary fatal weaknesses in Zedonis's analysis. First, it claims that Zedonis could not specify precisely where the purported fraying and fracture of the throttle cable took place within the sheath surrounding the throttle cable, in part because he did not measure the cable.[3] If the cable did not become frayed or break within the sheath, then the throttle would not have become stuck. The second purported fatal weakness Ford identifies is that, as of Zedonis's second deposition in September 2014, he had conducted testing of his theory that a single frayed wire making up part of the

---

[3] Ford also asserts Zedonis could not rule out the possibility that Karen had pushed the wrong pedal before entering the intersection and that this caused the accident. Berg's report found this possibility to be unlikely—based on the assumption that the throttle malfunctioned.

throttle cable could have caused the cable to stick within the sheath and testing had not proven his theory.

[27] The Appellants respond to these claims as follows. First, Zedonis stated in his February 2014 affidavit that photographs taken of the throttle cable show that it was within the cable assembly before springing out upon Zedonis's contact with it. Also, an x-ray of the cable assembly showed a worn and liberated wire of the cable within the assembly. Second, the Appellants deny that Zedonis's theory of the accident was dependent on there being only one frayed wire within the cable that bound the cable inside the cable sheath, and so Zedonis's failure to prove that one frayed wire could have caused the cable to stick is not fatal to his ultimate hypothesis. Among other things, Zedonis believed after examination that many of the exterior wires on the Monterey's throttle cable had worn through or nearly through, effectively leaving the cable with only thirteen of its forty-nine strands, resulting in a reduction in strength of 70.4%.

[28] This case is a quintessential example of a situation in which a trier of fact must be asked to sort out the evidence and any purported weaknesses in Zedonis's testimony. He did not make bald assertions based upon no evidence; he examined the evidence in great detail and reached certain conclusions after application of engineering principles. Ford contests whether those conclusions are in fact adequately supported by the evidence and whether Zedonis properly applied standard engineering principles. This is why trials are held. That an expert's opinion may ultimately be unaccepted by a fact finder is not a basis for rendering it inadmissible.

Our supreme court has clarified that an expert's opinion under Evidence Rule 702 does not require extensive and specific factual support. *Person v. Shipley*, 962 N.E.2d 1192, 1197 (Ind. 2012). "Rather, it only requires the trial court's satisfaction that the expert's opinion is based on reliable scientific principles that can be properly applied to the facts in issue." *Id.* "Moreover, . . . '[c]ross-examination permits the opposing party to expose dissimilarities between the actual evidence and the scientific theory. The dissimilarities go to the weight rather than to the admissibility of the evidence.'" *Id.* at 1198 (quoting *Turner*, 953 N.E.2d at 1051) (alteration in *Person*). Once reliability has been established, alleged discrepancies between the evidence and an expert's opinion go to the weight and credibility of the testimony, not to its admissibility. *Id.* These principles squarely apply to Zedonis's opinions.

## B. Exclusion for Purported Discovery Violation

Alternatively, the trial court also prohibited Zedonis from testifying at trial because of his examination of the throttle cable and conducting of tests after the discovery deadline in the case management order. Indiana Trial Rule 26(E)(1)(b) provides:

> A party is under a duty seasonably to supplement his response with respect to any question directly addressed to . . . the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

The duty to supplement under this rule is absolute and does not require a court order. *Everage v. N. Indiana Pub. Serv. Co.*, 825 N.E.2d 941, 951 (Ind. Ct. App.

2005). If a party fails to comply with Trial Rule 26(E) by not supplementing discovery responses, the trial court may, in its discretion, exclude the testimony of a witness. *Id.*

[31] On appeal, trial court sanctions for failing to comply with discovery orders are reviewed for an abuse of discretion. *Wright v. Miller*, 989 N.E.2d 324, 330 (Ind. 2013). Trial courts are presumed to "'act in accord with what is fair and equitable in each case,'" and we will only reverse "'if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the trial court has misinterpreted the law.'" *Id.* (quoting *McCullough*, 605 N.E.2d at 180). "The conduct and equities will vary with each case, and we thus generally leave that determination to the sound discretion of the trial courts." *Id.*

[32] That discretion is not absolute, however, as *Wright* made clear. In that case, the trial court in a medical malpractice case granted the defendant's motion to exclude the testimony of the plaintiffs' only expert witness and thus dismissed the case, where the plaintiffs' attorney failed to disclose the witness before the trial court's discovery deadline. Our supreme court acknowledged that trial courts, being closer to the litigation, have a better sense than appellate courts of what sanctions for discovery violations will adequately protect the litigants in any given case, and what sanctions are necessary to maintain the court's dignity, secure obedience to its process and rules, rebuke interference with the conduct of business, and punish unseemly behavior. *Id.*

[33]     In exercising this power, however, courts should attempt to apply sanctions that have a minimal impact on the evidence presented at trial and the merits of the case, nor should sanctions be imposed that are unjust. *Id.*; *see also* Ind. Trial Rule 37(B)(2) ("If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just[.]").  If offending conduct is primarily attributable to counsel and not the client, and there is little prejudice to the opposing party, courts should give due consideration to imposing sanctions directed primarily at counsel that minimize prejudice to the client and the merits of the case, while giving appropriate incentives to counsel to engage in proper behavior in the future. *Id.*  The *Wright* opinion also effectively treated exclusion of a witness that necessitates dismissal of a case as the sanction of dismissal itself. *See id.* at 330-31.

[34]     We conclude it was too draconian a punishment in relation to the Appellants' alleged wrongdoing to entirely preclude Zedonis from testifying.  Ford complains that Zedonis conducted additional testing following his October 9, 2013 deposition, after the case management order's discovery deadline, in response to questions from Ford's attorney regarding the validity of his testing and conclusions.  Ford has failed to adequately demonstrate how it was prejudiced by these actions; the mere fact that they occurred does not automatically translate into prejudice.  One action that Zedonis undertook was to measure the throttle cable, after his failure to do so was questioned during the October 2013 deposition.  But, Zedonis in any case discounted the

importance of such a measurement. It also is a measurement that Ford or its experts[4] could have undertaken at any time.

[35] Ford also seems to take great issue with Zedonis having conducted tests to determine if a single frayed wire within the throttle cable assembly could have bound the cable inside of the cable sheath. However, as Ford vigorously points out, those tests failed to prove that such an event could have occurred. If anything, this additional testing weakened, not strengthened, the Appellants' cases. The prejudice to Ford is difficult to discern.

[36] We further observe that Zedonis has been listed as an expert witness since June 2012, and the general nature of his opinions and expected testimony were long known. This was not a situation in which an expert was disclosed for the first time shortly before trial, or where an expert devised entirely new theories or opinions shortly before trial. Even if Zedonis's additional testing had led him to develop new theories, a more appropriate remedy for these late disclosures would be to exclude testimony related to such testing and theories, not complete exclusion of all of his testimony. *See Brown v. Terre Haute Reg'l Hosp.*, 537 N.E.2d 54, 58-59 (Ind. Ct. App. 1989) (affirming trial court's exclusion only of expert witness's testimony regarding opinion undisclosed before trial, not all of the testimony). We also note that Ford deposed Zedonis regarding his additional testing on September 4, 2014, or approximately six weeks before the

---

[4] It is not clear from the record before us whether Ford has hired any experts of its own; Ford's witness list is in neither of the appendices provided to us.

scheduled trial date of October 20, 2014. Ford fails to adequately explain why the nature of the additional testing Zedonis undertook could not be addressed by it or its own experts in that six-week period.

[37] Finally, we observe that none of the Appellants appear to have been involved in any misconduct in this case and that exclusion of Zedonis's testimony is fatal to their case. Without Zedonis's testimony, there is no evidence of a throttle cable malfunction; also, Berg's opinion regarding human driving factors is entirely dependent upon Zedonis's testimony. Indeed, it is clear Ford was correctly granted summary judgment in the absence of Zedonis's and Berg's testimony. We conclude, as did the *Wright* court, "that the circumstances of the present case warranted some lesser, preliminary, or more pointed sanction fashioned to address counsel's unsatisfactory conduct in this case without depriving the plaintiffs of their ability to present the merits of their case at trial." *Wright*, 989 N.E.2d at 331. We reverse the exclusion of Zedonis's testimony as a discovery sanction.

## II. Berg's Testimony

[38] We now turn to the exclusion of Berg's testimony. On appeal, Ford really only has two challenges to Berg's testimony. First, it asserts that it is inadmissible because it relies upon Zedonis's inadmissible expert opinions. Having ruled that the trial court erred in fully excluding Zedonis's testimony, this necessarily moots the argument that Berg's testimony must be excluded.

[39] Additionally, Ford contends that we ought not address the Appellants' arguments regarding Berg because they improperly included in their appendix an affidavit purported to be from Berg but which in fact was never signed by him or filed with the trial court. We have granted Ford's motion to strike that portion of the appendix and parts of the brief relying upon that affidavit. However, there is no indication that this was a deliberate misrepresentation by the Appellants, as explained in their response to the motion to strike. We have been provided with the appropriate affidavit in Ford's appendix. Any differences between the filed and unfiled affidavits are largely unimportant to the central issue on appeal regarding Berg's testimony—namely, whether it is inadmissible because Zedonis's testimony is inadmissible.

[40] We will find issues waived on appeal for failure to comply with the appellate rules where the violation substantially impedes us from reaching the merits of the appeal. *Ramsey v. Review Bd. of Indiana Dep't of Workforce Dev.*, 789 N.E.2d 486, 490 (Ind. Ct. App. 2003). Given the limited appellate issue regarding the admissibility of Berg's testimony, we decline to waive the Appellants' challenge to the trial court's exclusion of his testimony.

[41] On a final note, Ford's motion for summary judgment was entirely premised on the assumption that Zedonis's and Berg's testimony would be inadmissible at trial. Because we have ruled otherwise, this necessarily negates the grant of summary judgment in Ford's favor.

# Conclusion

[42] The trial court erred in excluding the testimony of Zedonis, either as a question of admissibility under Evidence Rule 702 or as a sanction for a purported discovery violation. Because Zedonis's testimony was erroneously excluded, Berg's testimony was as well. With Zedonis's and Berg's testimony, it is clear that Ford is not entitled to summary judgment. We reverse and remand for further proceedings consistent with this opinion.

[43] Reversed and remanded.

Riley, J., and Bailey, J., concur.