## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 08 2017, 8:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Edmond W. Foley
Douglas D. Small
Foley & Small
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Edward L. Murphy, Jr.
Jason A. Scheele
Lauren R. Deitrich
Rothberg Logan & Warsco L.L.P.
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Judy Harper, Estate of Terry D. Harper, II, *ex rel.* Judy Harper, *Appellants-Plaintiffs,* <br><br> v. <br><br> Bruce Harley, M.D., *Appellee-Defendant.* | September 8, 2017 <br><br> Court of Appeals Case No. 71A03-1611-CT-2523 <br><br> Appeal from the St. Joseph Superior Court <br><br> The Honorable Jenny Pitts Manier, Judge <br><br> Trial Court Cause No. 71D05-1601-CT-4 |

**Mathias, Judge.**

[1]   Judy Harper ("Judy"), individually and on behalf of the estate of her husband Terry Harper ("Terry"), sued Dr. Bruce Harley ("Harley") for medical

negligence in connection with Terry's death in 2012. After a four-day trial, a St. Joseph County jury returned a verdict for Harley. Judy now appeals the trial court's exclusion of certain evidence relating to Terry's medical history and the trial court's denial of her motion for a directed verdict as to Terry's cause of death. Harley cross-appeals, claiming the trial court erred in granting Judy's motion for partial summary judgment.

We affirm as to Judy's appeal. We therefore do not reach Harley's cross-appeal.

## Facts and Procedural Posture

For several years before 2012, Terry suffered from atrial fibrillation, a heart condition he managed with the help of blood-thinning medication. The effect of the blood thinner was to suppress the coagulants in Terry's blood, making it harder for Terry's blood to clot normally and making Terry more vulnerable to bleeding. Terry suffered internal abdominal bleeds in 2008 and 2010 ("the 2008 bleed," "the 2010 bleed," collectively, "the prior bleeds"). In both cases, doctors administered fresh frozen plasma, a substance extracted from donated blood that reverses the effect of the blood thinner by supplying the coagulants necessary to enable normal blood clotting, administration of which is indicated for bleeding coagulopathic patients. Terry recovered from both bleeds.

On the afternoon of January 25, 2012, Terry presented at the emergency room of a local hospital complaining of stomach pain. Harley, the responsible physician in the emergency room that day, examined Terry and ordered a CAT scan and blood work. The blood work showed Terry's blood was too thin to

clot, and, at around 9:00 p.m. that evening, the scan results indicated an abdominal bleed. Harley did not order fresh frozen plasma.

[5] Terry was discharged from the emergency room and admitted to the nonemergency medical floor around midnight. By 5:00 a.m., Terry was in severe distress. Terry died shortly before 6:00 a.m. The death certificate listed the causes of death as "acute abdominal bleed," "atrial fibrillation," and "coronary artery disease." Appellant's App. Vol. II, p. 17. Terry suffered from several health problems in addition to atrial fibrillation and coronary artery disease, including hypertension, congestive heart failure, sleep apnea, obesity, and a prior heart attack.

[6] As required by Indiana's Medical Malpractice Act, Ind. Code § 34-18-8-4; *Reck v. Knight*, 993 N.E.2d 627, 630 (Ind. Ct. App. 2013), *trans. denied*, before filing a complaint for medical malpractice, Judy submitted a proposed complaint to a medical review panel of three physicians. In late November 2015, the panel unanimously concluded that Harley "failed to meet the appropriate standard of care" and that this failure "was a factor in a lost chance of survival." Appellant's App. Vol. II, pp. 41, 44, 47. Judy filed her complaint for Terry's wrongful death and her loss of consortium in St. Joseph Superior Court on January 4, 2016.

[7] On March 7, 2016, Judy moved for partial summary judgment on the issues of duty, breach, and causation. On September 7, 2016, the trial court ruled for Judy, finding no genuine issues of material fact "as to whether [Harley] failed to

meet the appropriate standard of care" by failing to administer fresh frozen plasma to Terry, nor as to whether Harley's negligence "was a substantial factor in [Terry] having lost a chance for a better outcome." Appellee's App. Vol. II, p. 2. The only remaining triable issue was Judy's damages, resolution of which, the trial court noted, would "include a determination of [Terry's] percentage chance of survival before [Harley's] negligent acts or omissions, and [Terry's] percentage chance of survival after [Harley's] negligent acts or omissions." *Id.*

[8] On August 29, 2016, a week before the court's decision on Judy's motion for summary judgment, Harley filed a motion *in limine*, seeking exclusion at trial of *inter alia* "[a]ny testimony by witnesses or argument by . . . counsel regarding Harper's previous . . . bleeds [in 2008 and 2010] or that administering plasma would have prevented Harper's death." *Id.* at 220. On October 3, 2016, the court conditionally denied Harley's motion on that point, ordering that Judy was permitted "to provide expert testimony concerning the matters addressed [by Harley's motion], with the understanding that any such testimony should explain the rationale behind any such opinion and not simply be a conclusory statement." Appellee's App. Vol. III, p. 11.

[9] Judy's case was tried to a St. Joseph County jury over four days, from October 11, 2016, through October 14, 2016. Before the jury was seated on the first day of trial, the court restated its ruling as to the prior-bleed evidence: "[A]gain I'm going to require that [Judy's] witness be fully able to discuss the prior bleeds and how they do or do not differ from [the] one at issue, as well as how the

amount of fresh frozen plasma administered is or is not sufficient to . . . make a difference." Tr. Vol. II, p. 10.

[10] Judy called Dr. Robert Collins ("Collins") and Dr. Stephen Johantgen ("Johantgen"), the latter a member of the medical review panel. After hearing their testimony on Terry's prior bleeds, the trial court found no evidence that administration of fresh frozen plasma in 2008 "was . . . more probabl[y] than not the cause that he was able to walk out of that event[,]" Tr. Vol. III, p. 227, and concluded that the 2008-bleed evidence was therefore irrelevant and inadmissible. Judy's Exhibit 1, Terry's medical records from the 2008 bleed, were not admitted, and the jury was instructed that "the 2008 bleed is not relevant to any issue the jury is to determine. You[, the jury,] are to make no assumptions about [Terry] having survived that event." Tr. Vol. IV, pp. 194–95. The trial court's ruling covered only the evidence from 2008; evidence on the 2010 bleed was admitted and not withdrawn from the jury.

[11] Before closing argument, Judy sought a directed verdict that Terry's cause of death was abdominal bleeding, which the trial court denied. The jury returned a verdict for Harley; judgment was entered thereon.

[12] This timely appeal followed. Judy claims the trial court reversibly erred by excluding the 2008-bleed evidence, and by denying her motion for a directed verdict as to Terry's cause of death. Judy seeks a new trial. If we grant the relief sought, Harley asks us to consider his cross-appeal: whether the trial court erred

in granting Judy's motion for summary judgment on duty, breach, and causation.

## Standard of Review

[13] The decision to exclude evidence is within the trial court's sound discretion, and we will reverse only for prejudicial abuse of that discretion. *Linton v. Davis*, 887 N.E.2d 960, 965 (Ind. Ct. App. 2008), *trans. denied*. A trial court abuses its discretion by ruling contrary to the logic and effect of the facts and circumstances before it, or by misinterpreting the law. *Id.* But we will not reverse an erroneous evidentiary ruling if the error was harmless, that is, if the probable impact of the erroneously excluded evidence on the trier of fact, in light of all the evidence in the case, was sufficiently minor so as not to affect a party's substantial rights. *Kimbrough v. Anderson*, 55 N.E.3d 325, 334 (Ind. Ct. App. 2016), *trans. denied*. Because Harley's submission on this issue does not address Judy's assignment of error,[1] our review is for *prima facie* error, error that is apparent "at first sight, on first appearance, or on the face of it." *Trinity Homes, L.L.C. v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006).

[14] The decision to deny a motion for a directed verdict, or for judgment on the evidence, is reviewed on appeal under the same standard as applied by the trial

---

[1] Judy's position is that the trial court applied the wrong legal standard to the admissibility of the 2008-bleed evidence, which she defends with cogent argument and citation to authority. Harley never addresses the legal standard applied by the trial court, and his brief on this issue is largely irrelevant and devoid of citation to authority but for one passing reference to Evidence Rule 403.

court. *Hill v. Rhinehart*, 45 N.E.3d 427, 435 (Ind. Ct. App. 2015), *trans. denied*. We consider only the evidence and reasonable inferences therefrom favorable to the non-movant. *Id.* A directed verdict is proper only where there is a total failure of proof by the non-movant as to an essential element, or where the evidence is without conflict and susceptible of only one interpretation, which is favorable to the movant. *Id.*

## Discussion and Decision

[15] As an initial matter, we note that, from the opinion of the medical review panel to the trial court's order on summary judgment, this case was conceived of as a "loss of chance for survival" case. *See Ind. Dep't of Ins. v. Everhart*, 960 N.E.2d 129, 133 (Ind. 2012) (measure of damages); *Alexander v. Scheid*, 726 N.E.2d 272, 276 (Ind. 2000) (situations where applicable), 278 (standard of liability); *Mayhue v. Sparkman*, 653 N.E.2d 1384, 1387 (Ind. 1995) (nature of causation analysis and how distinct from traditional proximate-cause analysis). The medical review panel was unanimous in concluding that Harley's breach of the standard of care "was a factor in a lost chance of survival[,]" Appellant's App. Vol. II, pp. 41, 44, 47, and the trial court unequivocally ruled that Harley's negligence "was a substantial factor in [Terry] having lost a chance for a better outcome." Appellee's App. Vol. II, p. 2. Damages, which the trial court's summary judgment order again unequivocally identified as the only remaining triable issue, would "include a determination of [Terry's] percentage chance of survival before [Harley's] negligent acts or omissions, and [Terry's] percentage chance of survival after [Harley's] negligent acts or omissions." *Id.*

[16] But at some point between the trial court's September 7, 2016, order on summary judgment, and submission of the case to the jury on October 14, 2016, plaintiff's counsel elected to forgo a trial on loss-of-chance damages in favor of a trial on traditional proximate causation and full wrongful-death damages. The trial court's preliminary instructions, given without recorded objection from either party, instructed the jury that Judy had to prove that Harley's negligence "was a responsible cause"[2] of Terry's death. Tr. Vol. II, p. 22. The court's final instructions, again given without recorded objection, were identical to its preliminary instructions in this respect. Tr. Vol. IV, p. 239. Defense counsel told the jury in opening statements, "We're not here on a lost chance of survival case." Tr. Vol. II, p. 51. Plaintiff's counsel either chose this course or acquiesced in its being taken, but does not so much as acknowledge the variance in either of the briefs on appeal.

[17] We review the trial as it was tried. Specifically, we review Judy's appeal as a traditional claim for medical negligence proximately causing death, *Scheid*, 726 N.E.2d at 279, rather than the loss-of-chance damages case contemplated by the trial court's summary judgment order. Importantly, our review under the latter rubric would be of no use to Judy. Any error we might find would be harmless because there was not sufficient evidence presented on which the jury could have based a non-speculative loss-of-chance damages award, *Wolfe v. Estate of*

---

[2] Our most recent model jury instructions use this term in place of "proximate cause." *Green v. Ford Motor Co.*, 942 N.E.2d 791, 796 n.1 (Ind. 2011).

*Custer by Custer*, 867 N.E.2d 589, 599 n.10, 602 (requiring some evidence permitting quantification of increased risk of harm), and no probability that the jury would have done so without being instructed to.

[18] The parties accepted the trial court's ruling that Harley's failure to administer fresh frozen plasma to Terry fell beneath the standard of care. Judy then had to show (or rather, chose to have to show) that Harley's negligence proximately caused Terry's, and derivatively her injuries, *Mayhue*, 653 N.E.2d at 1386. In particular, because a proximate cause is a cause-in-fact, it was Judy's burden to show that, but for Harley's negligence, Terry probably would have survived the events of January 25 and 26, 2012.

## I. The Trial Court Did Not Reversibly Err in Excluding the 2008-Bleed Evidence

[19] We begin by defining the scope of the trial court's ruling as to the 2008-bleed evidence. We next note the trial court's basis for its ruling. We then conclude that Judy waived her claim on appeal by failing to raise it below, and that any error was harmless in any case.

### A. Scope of Ruling

[20] First, Collins was not permitted to opine as to any causal connection between the administration of fresh frozen plasma in 2008 and Terry's survival in 2008, nor to base his opinion as to Terry's chances in 2012 on the 2008 evidence. But, very importantly, this ruling was not entered on alleged irrelevancy, but as a discovery sanction for plaintiff's counsel's failure to disclose until the first day

of trial that Collins's opinion on this matter would be sought. *See* Ind. Trial Rule 26(E)(1)(b) (continuing duty of proponent of expert testimony to supplement prior discovery responses as to "subject-matter" and "substance" of testimony expected); *O'Banion v. Ford Motor Co.*, 43 N.E.3d 635, 646 (Ind. Ct. App. 2015), *trans. denied* (exclusion of new opinion appropriate remedy for late disclosure of newly formed expert opinions). The trial court further barred Collins from testifying as to how quickly fresh frozen plasma was administered to Terry in the 2008 bleed because those facts "support[ed] an opinion that [couldn't] be admitted [because of the trial courts's earlier ruling concerning the irrelevancy of the 2008 bleed as presented] . . . [namely] that rapid administration was what resulted in the positive outcome in 2008. Tr. Vol. II, p. 122. Plaintiff's counsel was permitted to elicit Collins's testimony as to the sequencing and timing of administering fresh frozen plasma in general, without specific reference to the administration of fresh frozen plasma in 2008.

[21]     Second, the following testimony of Johantgen drew a conclusion from the administration of fresh frozen plasma in 2008 that the trial court would later prohibit the jury from applying to the 2012 bleed by the subject ruling:

> Q.        Do you have an opinion as to whether the fresh frozen plasma given to . . . Mr. Harper in 2009 was a causative reason for him being able to survive that bleed?
>
> A.        Yes.
>
> Q.        What is your opinion?

A.      Yes, certainly. Yes, I believe that that was certainly—certainly helpful in his—in his survival.

Q.      Okay.

A.      Couldn't actually predict what happened if he did not get it, but it certainly was the thing to do, and certainly further[ed] his chances of survival.

Tr. Vol. II, p. 228. The trial court's later ruling instructed the jury "to make no assumptions about [Terry] having survived" in 2008. Tr. Vol. IV, pp. 194–95.

[22]    Third, Dr. Gregory Henry ("Henry"), testifying for the defense, drew the opposite conclusion from the administration of fresh frozen plasma in 2008:

Q.      Do you believe that the fresh frozen plasma that [Terry] was given in 2008 was the reason he survived the incident?

A.      Unlikely. . . .

Q.      [W]ould you draw any possible causal connection between the administration of four units of fresh frozen plasma to Mr. Harper in 2008 and the fact that he survived[?] . . .

A.      I think that he survived, he got the medicine. There's nothing that indicates that medicine actually caused the survival. They . . . are independently occurring events.

Tr. Vol. III, pp. 38–40. The trial court would later also prohibit the jury from applying this conclusion to the 2012 bleed in its later ruling instructing the jury

"to make no assumptions about [Terry] having survived" in 2008. Tr. Vol. IV, pp. 194–95.

[23] Fourth, Judy's Exhibit 1, Terry's medical records from the 2008 bleed, was not admitted. The records described diagnoses of among other things, hypocoagulability due to the blood thinner and spontaneous bleeding, as well as Terry's treatment with fresh frozen plasma and his subsequent recovery. Appellant's App. II, pp. 18–30. Exhibit 1 did not make any express causal connection between the former and the latter. Exhibit 1 also recorded the timing of the various steps in Terry's treatment.

[24] Finally, the trial court permitted plaintiff's counsel to rely on the rate of administration of fresh frozen plasma in 2008 so long as causation was not implied:

> [Court:] I'm permitting [plaintiff's counsel] to . . . only refer to the rate evidence, not tie it up to [Terry's] survival, he walked out the door, anything. Just that it's possible—"You've heard evidence that it's possible to"—
>
> [Counsel:] The rate? The rate? Okay. . . .
>
> [Court:] Not [in Terry's particular case] even. That it is possible to receive and administer fresh frozen plasma, four units of it, within approximately 80 minutes. Okay? Don't tie it up with him or the survival.

Tr. Vol. IV, p. 191.

## B. Basis of Ruling

As outlined above, Collins's opinion on causation with respect to the 2008 bleed was excluded as a discovery sanction. Once Collins's testimony had been so limited, the trial court, relying in part on its ruling on Harley's motion *in limine*, required some other evidence of causation—specifically, evidence that constituted or permitted proof of causation by a preponderance of the evidence—to permit admission of the 2008-bleed evidence without limitation:

> [Court:]      [T]here was an objection that [Collins] was offering an opinion—he was going to—wanted to offer an opinion, about something that [plaintiff's counsel] hadn't disclosed. And my feeling was if [Collins] was allowed to testify to the facts and there wasn't some other expert who could support—supply the causative element, that the jury would just be left to believe it could infer on its own . . . .
>
>      [T]he problem is it's—it's—[the jury] can't assess what to make of th[e] factual data [from 2008]. They are not physicians. And nobody has testified that the administration of fresh frozen plasma would have, you know—was the reason—was probably the cause of—more probabl[y] than not the cause that [Terry] was able to walk out of [the hospital in 2008]. So the jury can't supply that. And to have that data hanging out there to either directly or suggest inferentially that the jury can make that assessment is not proper. . . .
>
>      The only reason for having [the 2008 bleed] to be considered by the jury is for them to draw the inference that the fresh frozen plasma was the reason [Terry survived in 2008]. And there's got to

be medical or expert testimony that supports that. And Dr. Collins, if he had th[e] opinion [that fresh frozen plasma caused Terry's survival in 2008], hadn't disclosed it. And this Dr. Johantgen was shy of that [by testifying only that fresh frozen plasma was a "causative reason," rather than a "responsible cause," of Terry's survival in 2008]. And it's up to the jury to then make that inference. And they can't do that. That's not appropriate.

Tr. Vol. III, pp. 225, 227–28.

### C. Waiver and Harmlessness

[26] For her appeal, Judy claims that the trial court improperly required proof of causation by a preponderance of the evidence as a predicate to admission of the 2008-bleed evidence; that the 2008-bleed evidence was relevant under Evidence Rule 401; that its probative value was not substantially outweighed by the dangers of Evidence Rule 403; and that exclusion "eviscerated" Judy's case for causation as to the 2012 bleed. Appellant's Br. at 14.

[27] Judy waived this line of attack on the trial court's ruling by failing to raise it below. *See Perez v. Bakel*, 862 N.E.2d 289, 295 (Ind. Ct. App. 2007). Specifically, plaintiff's counsel never voiced a single note of opposition to proof of causation by a preponderance as a predicate for admission of the 2008-bleed evidence. Defense counsel proposed the standard on the first day of trial before the jury was seated and preliminarily instructed. Tr. Vol. II, p. 5. Plaintiff's counsel was silent. The court then adopted defense counsel's proposed standard: "I'm going to require that your witness be fully able to discuss the prior bleeds and . . . how

the amount of fresh frozen plasma administered is or is not sufficient to be—at a level *to make a difference*." *Id.* at 10 (emphasis added). Again plaintiff's counsel was silent.

[28] After Collins and Johantgen had testified, and the parties debated whether Johantgen's testimony had laid a sufficient foundation for admission of the 2008-bleed evidence, the court asked plaintiff's counsel directly, "What consequence is to be made of the fact that Dr. Johantgen didn't testify to the level of evidentiary significance that he needed to [by testifying that fresh frozen plasma in 2008 was a "causative reason" for Terry's survival but not a "responsible cause"]." Tr. Vol. III, p. 224. Plaintiff's counsel responded that it did not have "any effect" because *Harley's witnesses*

> talked about all of the readings in the records. Now to not admit that stuff, it's been discuss ed not only in our cases but with their own expert. . . . [N]ow it's out there. And I think it's only fair to put those records, both '08 and '10, in, Your Honor.

*Id.* at 224. At best, counsel's response was a simple failure to object in the terms now argued on appeal.

[29] We acknowledge that this standard did not appear in the trial court's order on Harley's motion *in limine*. Defense counsel cited no authority for its application when it was proposed, and the trial court did not disclose the legal basis for its adoption. But it was precisely for this reason that contemporaneous objection was required to preserve the issue properly for review. Particularly in a case such as this, where the claims to be tried—and thus the grounds of evidentiary

relevancy and admission—shifted repeatedly without notice or explanation in the record, we are not in a position to review the trial court's exercise of its discretion in light of the facts and circumstances before it, because we do not have a full account of those facts and circumstances before us absent a record developed by contemporaneous objection. In short, if plaintiff's counsel thought the trial court was applying an incorrect standard, he ought to have afforded to the trial court the opportunity to correct or explain its application. Judy will not be heard on this issue for the first time on appeal.

[30] Waiver notwithstanding, however, review on the merits would be of no help to Judy because any error was harmless in light of all the evidence actually admitted in the case. What she characterizes as the "eviscerat[ion]" of her case was no such thing. Appellant's Br. at 14.

[31] Judy argues that the trial court's ruling precluded her from presenting evidence on the rate of administration of fresh frozen plasma, specifically evidence that Terry could have received enough fresh frozen plasma in time to save his life. It was one of Harley's chief arguments that Terry's bodyweight was too high, and his general health too fragile, for sufficient amounts of fresh frozen plasma to be administered rapidly enough to prevent Terry's death. In 2008, Terry received four units of fresh frozen plasma in one hour and twenty-one minutes. But this and other evidence of timing and rate of administration, per the trial court's order permitting it from Collins and per plaintiff's counsel's examination of witnesses other than Collins, was put before the jury at closing argument:

Dr. Harley admitted that if he had chosen to give fresh frozen plasma . . . Terry could have gotten it in two to three hours. Dr. Johantgen estimated it would take 60 to 90 minutes. Dr. Collins . . . was questioned by [defense counsel] in his deposition and he agreed . . . that the best you could hope for in 2012 was 45 minutes from the time of ordering to [infusion]. . . .

If you . . . take their 45 minutes to 90 minutes, . . . that would have given Terry at least six hours of exposure. And even under their own expert's testimony he could have survived . . . .

[Collins] said that [Terry] was healthy enough to have received the fresh frozen plasma. He says that the vital signs suggest [Terry] would have done very well with that[.] . . .

[Henry, one of Harley's experts,] said if you hang a couple of those bags[, i.e., units of fresh frozen plasma,] you can process it maybe in a couple of hours. He also talked about that *it's possible to get . . . four units infused within an hour and 21 minutes.*

Even if you use their own documentation on [the timing question], it was clear that if Dr. Harley . . . had ordered [fresh frozen plasma] when he should have, after the CAT scan results, he had enough time go get the fresh frozen plasma and to make it therapeutic. Dr. Collins said that clearly. Dr. Johantgen said that clearly.

Henry . . . said that you can get *four units of fresh frozen plasma within an hour and 21 minutes.* So if you—if you say the CAT scan's at 9:15. . . . Go from 9:15 to 10:30. . . . [T]here's four units. Then you go from 10:30 . . . to 12:00, now he's got eight units. . . . And then [by] 1:30 to 3:00, he's got 16 units. . . . It's only three o'clock in the morning, two hours before he dies. He clearly, under their own evidence, could have gotten enough fresh frozen plasma to have survived.

Tr. Vol. IV, pp. 201–02, 205, 207, 231–33 (emphasis added).

[32]     In light of all the evidence as to timing received by the jury, we cannot perceive what material facts were actually withheld from it. Judy responds that "argu[ing] in *general* terms" about four units in circa eighty minutes was not the same "as being able to argue that *this particular patient*" could withstand that rate of administration, Appellant's Reply Br. at 11, but, as recited above, Judy did present evidence from Collins about Terry's capacity to receive plasma. And Terry's capacity to tolerate administration of fresh frozen plasma at a certain rate in 2008 was only weakly probative of his same capacity in 2012, as it was not seriously contested that Terry's comorbidities had worsened significantly in that period.

[33]     Finally, we see no or only minimal probability that the outcome in this case would have been different had the jury been permitted to draw an inference as to Terry's death in 2012 from Terry's survival in 2008. As contemplated by the trial court's subject ruling, Terry's survival in 2008 was relevant to his death in 2012 only if the administration of fresh frozen plasma in 2008 played a role in his survival, and only to the extent that a similar outcome could have been expected in 2012. The *only* evidence for the former was Johantgen's testimony that administration of fresh frozen plasma in 2008 was "certainly helpful" to Terry. Tr. Vol. II, p. 228. Particularly in the absence of evidence that Terry was in mortal danger in 2008 (i.e., without medical intervention, Terry probably would have died in 2008), Johantgen's testimony was only weakly probative of the effect fresh frozen plasma would have had in 2012. And there was little evidence supporting direct comparison between 2008 and 2012: the bleeds were

of different natures, the protocols for administering fresh frozen plasma had changed, and Terry was a changed patient. The question was never whether fresh frozen plasma can be life-saving in the abstract; the only question was whether fresh frozen plasma would have saved Terry's life on January 25 and 26, 2012.

[34] In sum, the 2008-bleed evidence, to the extent that it was relevant, probative, and then actually excluded, was cumulative of Judy's strongest evidence: the opinions of Collins and Johantgen, established through extensive direct testimony and defended by plaintiff's counsel's extensive cross-examination of Harley's experts, that administration of fresh frozen plasma in 2012 more likely than not would have prevented Terry's death. But the jury was not persuaded. Judy has not carried her burden in this appeal to show any reasonable likelihood of a different outcome had the jury been permitted to consider that fresh frozen plasma was "certainly helpful" to Terry in 2008. Tr. Vol. II, p. 228.

## II.  The Trial Court Did Not Err in Failing to Grant Judy's Motion for a Directed Verdict

[35] Judy claims next that the trial court reversibly erred in failing to grant her motion for a directed verdict as to Terry's cause of death. Because the evidence was neither without conflict nor susceptible of only one interpretation favorable to Judy, we disagree. Specifically, a reasonable jury could have concluded that Judy had not proved by a preponderance of the evidence that intra-abdominal bleeding was the sole cause of Terry's death.

[36] There was no autopsy, and the medical review panel was unable to determine a cause of death. The death certificate listed Terry's three causes of death as "acute abdominal bleed," "atrial fibrillation," and "coronary artery disease." Appellant's App. Vol. II, p. 17. Collins and Johantgen testified that the cause of death was the abdominal bleed. But Henry testified that it was not possible to identify one probable cause of death in Terry's case, and that the "most probable cause of death" was some combination of the abdominal bleed, ventricular fibrillation, and medication-induced suppression of cardiac function. Tr. Vol. III, p. 102. Dr. James Walter, another expert for Harley, testified that the "two most likely causes of death" were the abdominal bleed and myocardial infarction. Tr. Vol. IV, p. 31.

[37] This evidence at least permits a reasonable inference that the abdominal bleed was not the sole or sufficient cause of Terry's death, but was only fatal in combination with other factors. Moreover, the evidence given by the expert witnesses as to the facts underlying their opinions could have led the jury to reasonably favor another causal factor over the abdominal bleed. It was not error for the trial court to leave the question where it was: within the province of the jury.

## Conclusion

[38] Judy waived her challenge to the trial court's exclusion of the 2008-bleed evidence, and any error was harmless. The trial court properly denied Judy's motion for a directed verdict on Terry's cause of death. Its judgment is therefore affirmed, and Harley's cross-appeal is moot.

Affirmed.

Altice, J., concurs.

Kirsch, J., dissents with opinon.

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Judy Harper, Estate of Terry D. Harper, II, *ex rel.* Judy Harper, *Appellants-Plaintiffs,* | Court of Appeals Case No. 71A03-1611-CT-2523 |
| v. | |
| Bruce Harley, M.D., *Appellee-Defendant.* | |

**Kirsch, Judge, dissenting.**

In 2008, Terry Harper ("Terry") who had atrial fibrillation, a heart condition managed with blood-thinning medication, suffered an abdominal bleed and went to the hospital emergency room.  There, he was treated with fresh frozen plasma.  Fresh frozen plasma is extracted from donated blood.  It supplies the coagulants necessary to enable normal blood clotting, thus mitigating the effect of the blood thinner medication.  Terry survived.

In 2010, Terry continued to suffer from atrial fibrillation.  He, again, suffered an abdominal bleed, and again, he went to the hospital emergency room where, again, he was treated with fresh frozen plasma.  Terry again survived.

In 2012, Terry suffered another abdominal bleed.  He went to the emergency room with the same symptoms as in 2008 and 2010, but he received different medical treatment.  On this occasion, he was treated in the hospital emergency

room by Dr. Bruce Harley, the defendant in this action. Dr. Harley did not treat Terry with fresh frozen plasma. Rather, he discharged Terry from the emergency room to a non-emergency medical unit where Terry died a few hours later. The death certificate listed the causes of death as "acute abdominal bleed," "atrial fibrillation," and "coronary artery disease." Appellant's App. Vol. II at 17.

[43] In 2015, a medical review panel of three doctors convened under Indiana's Medical Malpractice Act unanimously concluded that Harley "failed to meet the appropriate standard of care" and that his failure "was a factor in a lost chance of survival." Appellant's App. Vol. II, at 41, 44, 47.

[44] Terry's wife, Judy, filed a Complaint for medical malpractice and a motion for partial summary judgment on the issues of duty, breach, and causation. The trial court entered partial summary judgment finding no genuine issues of material fact "as to whether [Harley] failed to meet the appropriate standard of care" by failing to administer fresh frozen plasma to Terry, nor as to whether Harley's negligence "was a substantial factor in [Terry] having lost a chance for a better outcome." Appellee's App. Vol. II at 2. The only remaining triable issue was Judy's damages which, the trial court noted, would "include a determination of [Terry's] percentage chance of survival before [Harley's] negligent acts or omissions, and [Terry's] percentage chance of survival after [Harley's] negligent acts or omissions." *Id.*

[45] Harley filed a motion *in limine*, seeking to exclude "[a]ny testimony by witnesses or argument by . . . counsel regarding [Terry]'s previous . . . bleeds [in 2008 and 2010] or that administering plasma would have prevented [Terry]'s death." *Id.* at 220. The trial court conditionally denied Harley's motion, ordering that Judy was permitted "to provide expert testimony concerning the matters addressed [by Harley's motion], with the understanding that any such testimony should explain the rationale behind any such opinion and not simply be a conclusory statement." Appellee's App. Vol. III at 11.

[46] Prior to trial, the court restated its ruling as to the prior-bleed evidence: "[A]gain I'm going to require that [Judy's] witness be fully able to discuss the prior bleeds and how they do or do not differ from [the] one at issue, as well as how the amount of fresh frozen plasma administered is or is not sufficient to . . . make a difference." Tr. Vol. II at 10. At trial, the court excluded the evidence of the decedent's prior abdominal bleed in 2008 and its treatment.

[47] I believe that the trial court erred in excluding the evidence of Terry's 2008 abdominal bleed. The evidence of this bleed, and its treatment, like that suffered by Terry in 2010, was relevant to the circumstances of Terry's 2012 abdominal bleed which led to his death. The jury should have heard and considered this evidence in order to reach its verdict.

[48] Accordingly, I respectfully dissent.