# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**HUGH N. TAYLOR**
Auburn, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ELLEN H. MEILAENDER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DAVID E. LYONS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 76A03-1112-CR-582 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE STEUBEN CIRCUIT COURT
The Honorable Allen N. Wheat, Judge
Cause No. 76C01-1010-FA-1016

**October 11, 2012**

**OPINION–FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant David E. Lyons appeals his convictions for five counts of Child Molesting,[1] a class A felony. Specifically, Lyons contends that his convictions must be reversed because fundamental error occurred when a child psychologist was permitted to testify about various characteristics and behaviors that are common in child sexual abuse victims. Finding no error, we affirm the judgment of the trial court.

FACTS

K.F. was born in December 1995. K.F.'s paternal grandmother babysat for K.F. on a daily basis while her parents were at work. Lyons, who is K.F.'s uncle, was born in 1960, and he lived with his parents from 2004 to 2006 in Steuben County. During these years, Lyons spent periods of time alone in his bedroom with K.F. He bought K.F. ice cream, a laptop computer, paid for her tenth birthday party, and told her that she was beautiful.

K.F.'s grandmother also babysat for K.F.'s friend, Jessica Mofield. Lyons would tell Jessica that he thought K.F. was "hot" and that Jessica was the type of girl that people wanted to marry but that K.F. was the kind of girl that people wanted to date. Tr. p. 539-40.

Sometime in 2004, Lyons began molesting K.F. On one occasion, Lyons placed his hands in K.F.'s underwear and put his fingers inside K.F.'s vagina while she was sitting on Lyons's lap playing a computer game. At some point during the encounter, Lyons told K.F. that she should "trust him." Id. at 404.

---

[1] Ind. Code § 35-42-4-3.

On another occasion, Lyons again put his fingers inside K.F.'s vagina. And in another instance, when K.F. was still eight years old, Lyons put K.F. on his bed, removed all of her clothes, and put his tongue inside her "private." Tr. p. 410-15. At some point in 2004, Lyons made K.F. put her mouth on his penis and told her not to tell anyone.

In the summer of 2006, Lyons removed K.F.'s pants and tried to put his penis inside her. Lyons's penis touched both the "outside and the inside" of K.F.'s genitals. However, his penis would "only go in a little way," and it hurt K.F. Id. at 424-29. Lyons again told K.F. not to tell anyone about the incident. That same summer when Lyons and K.F. were in the garage at her house, Lyons picked up a board with a hole in it, placed his penis through the hole, and had K.F. put her mouth on his penis.

Also during the summer of 2006 just before leaving for vacation, K.F. noticed that she was bleeding from her "private area." Tr. p. 447-48. During their vacation, K.F.'s mother observed that K.F. had some redness and irritation in and around her genitals. Later that same year, K.F. told Mofield about the incident involving the board when Lyons made her put her mouth on his penis. Id. In January 2010, K.F. told her then-boyfriend, Nathan Beatty, that her uncle had "raped" her when she was younger. Id. at 434-38, 599-601. K.F. was crying when she told him about this and told Beatty not to tell anyone. Although Beatty urged K.F. to tell her mother about the incident, she decided not to do so. Later in 2010, K.F. told her mother that Lyons had hurt her, but she refused to say anything more.

At some point, K.F. feared that Lyons was going to molest her younger sister and developed a number of emotional problems. For instance, K.F. attempted to run away from home after a fight with her parents. When K.F.'s mother found her, she took K.F. to a local hospital. While there, K.F. began to scream, "don't touch me" when the nurses were trying to hold her down. Tr. p. 566. She also yelled, "he touched me." Id. K.F. then disclosed that Lyons had been molesting her. During a physical examination, a nurse discovered a scar from a one-centimeter laceration on K.F.'s genitals that was at least a year old. The nurse determined that it was probably the result of a forcible injury.

On October 14, 2010, the State filed five counts of child molesting, a class A felony, against Lyons. Count I alleged an act of sexual intercourse with K.F., and the remaining counts alleged various acts of deviate sexual conduct. Counts I and II alleged acts that occurred between June 1, 2006, and September 1, 2006, while the other three counts covered a time period between January 1, 2004, and September 1, 2006.

At a jury trial that commenced on August 17, 2011, the State called Dr. Judith Williams to testify. Dr. Williams is a licensed clinical psychologist with extensive experience counseling child victims of sexual abuse. Although Dr. Williams had counseled K.F. from April to June of 2010, her testimony was not specifically related to K.F.'s treatment.

Instead, Dr. Williams testified about general characteristics, mannerisms, and behaviors that are common among child abuse victims. When the deputy prosecutor asked Dr. Williams to describe the type of person to whom a child will initially disclose

4

abuse, Lyons objected on the grounds that the question "called for speculation." Tr. p. 518. After Dr. Williams confirmed that her answer would be based on "studies," the trial court overruled the objection. Id. Lyons made no further objection to Dr. Williams's testimony.

Dr. Williams testified that sex abuse victims will spend time with the offender if the victim feels "special." Id. at 517-27. And most of the time, the victim does not want the offender to get in trouble. Dr. Williams testified that victims feel guilty, are depressed, and lack self esteem. Moreover, some victims have suicidal thoughts.

Dr. Williams also testified that children often do not disclose instances of abuse because they are confused or embarrassed and believe that the offender's actions are their fault. The child victim also is quite often afraid of the offender and feels obligated to keep a promise made to the offender not to tell anyone about the abuse.

Following the presentation of the evidence, Lyons was found guilty on all counts and subsequently sentenced to thirty years on each count. The sentences were ordered to run consecutively to each other for an aggregate term of 150 years. Lyons now appeals.

<u>DISCUSSION AND DECISION</u>

Lyons claims that the trial court erred in permitting Dr. Williams to testify at trial about characteristics and behaviors common among child molest victims. More specifically, Lyons contends that it was fundamental error to permit such opinion testimony that was based upon psychological studies when no basis for reliability was

5

established. In short, Lyons contends that his convictions must be reversed because Dr. Williams based her responses on speculation.

In resolving this issue, we initially observe that Lyons failed to object to Dr. Williams's testimony regarding the behaviors and characteristics that child molestation victims display. As noted above, Lyons objected only once to Dr. Williams's testimony—"to the form of the question" which called for "speculation" when the deputy prosecutor asked Dr. Williams whom a child victim will generally tell about incidents of sexual abuse. Tr. p. 518. That objection is not the same as the argument that Lyons is now raising on appeal. Thus, his claim is waived. See Brown v. State, 783 N.E.2d 1121, 1125-26 (Ind. 2003) (holding that the failure to make a contemporaneous objection at trial waives any claim on appeal that evidence was improperly admitted). Moreover, a defendant cannot object on one ground at trial and then raise a different claim of error on appeal. Small v. State, 736 N.E.2d 742, 747 (Ind. 2000).

In an effort to circumvent waiver, Lyons argues that he is entitled to a reversal on the basis of fundamental error. Fundamental error, however, is an extremely narrow exception that applies only where the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. Mendenhall v. State, 963 N.E.2d 553, 567 (Ind. Ct. App. 2012), trans. denied.

The fundamental error exception is available only in egregious circumstances. Id. And the mere fact that error has occurred and that it will prejudice the defendant is not

6

sufficient to invoke the fundamental error exception; rather, the error must be such that the defendant could not possibly have received a fair trial and that the appellate court is left with the conviction that the verdict is clearly wrong and of such dubious validity that justice cannot permit it to stand. Owens v. State, 937 N.E.2d 880, 885 (Ind. Ct. App. 2010), trans. denied.

> That said, we note that Indiana Evidence Rule 702(a) provides that
>
> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In construing the above, only one of these characteristics—knowledge, skill, experience, training, or education—is necessary to qualify an individual as an expert. Otte v. State, 967 N.E.2d 540, 547 (Ind. Ct. App. 2012), trans. denied.

In our view, Lyons mistakenly contends that Dr. Williams's testimony was "scientific testimony" and is therefore governed by the principles set forth in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993),[2] and the requirements of Evidence Rule 702(b). This rule provides that "[e]xpert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." (Emphasis added).

---

[2] Among other things, Daubert declared that when "faced with a proffer of expert scientific testimony, the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592. Daubert also observed that "the statements constituting scientific explanation must be capable of empirical test," and "another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication . . . is not the sine qua non of admissibility; it does not necessarily correlate with reliability." Id. at 592-93.

Our Supreme Court has determined that the "specialized knowledge" set forth in Evidence Rule 702(a) is not necessarily scientific knowledge, and it need not be proven reliable by means of "scientific principles." Malinski v. State, 794 N.E.2d 1071, 1084 (Ind. 2003). Rather, such evidence is governed only by the requirements of Rule 702(a), and any weaknesses or problems in the testimony go only to the weight of the testimony, not to its admissibility, and should be exposed through cross-examination and the presentation of contrary evidence. Turner v. State, 953 N.E.2d 1039, 1050 (Ind. 2011).

Dr. Williams was testifying to specialized knowledge about sex abuse victims based on her training, education, and experience as a licensed clinical psychologist who has extensive experience counseling victims of sexual abuse. Her testimony was not based on any scientific principles or rules. Rather, Dr. Williams was testifying generally about matters commonly observed in sexual abuse victims in the psychological literature and in her own practice.

Dr. Williams has specialized knowledge in the area of child sexual abuse that goes beyond the knowledge generally held by lay observers. She is a licensed and practicing clinical psychologist with masters degrees in counseling education and clinical psychology as well as a doctorate in clinical psychology. Dr. Williams has had "considerable experience" counseling patients who are victims of sexual abuse. Tr. p. 514-15. Approximately one-third of Dr. Williams's practice consists of children, and about one-third of those patients have been sexually abused, meaning that she counsels approximately one hundred sexually abused children per year. In other words, Dr.

8

Williams has specialized knowledge in the area of child sexual abuse that would assist the jury in understanding the evidence and determining the facts at issue.

We note that while jurors can and should rely on their own common sense, a search for the truth also requires them to understand and consider the extent to which their personal assumptions may be invalid. Gaining insight and information from a witness with a deep knowledge of, and extensive experience in, a relevant field helps the jurors to perform their task more accurately. We also note that Lyons was free to cross-examine Dr. Williams regarding the studies upon which she was relying and to emphasize for the jury that these studies may have been only valid for treatment purposes and thus not intended to be used for diagnostic purposes or as reliable tools for assessing whether abuse actually occurred.

Additionally, we cannot agree with Lyons's assertion that the admission of Dr. Williams's testimony violates the principles set forth in Steward v. State, 652 N.E.2d 490 (Ind. 1995). Steward addressed the propriety of admitting Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence. Id. at 491-93. The CSAAS evidence presented at trial was not intended to serve as a diagnostic tool to prove that sexual abuse had occurred; rather, it was intended for use in treating victims and their families, and it "help[ed] to explain reactions, such as recanting or delayed reporting, of children assumed to have experienced abuse." Id. at 493. Therefore, the Steward court determined that the CSAAS evidence could not be used to prove, either directly or by implication, that abuse actually occurred in that case. Id. at 499.

9

On the other hand, it was also established in Steward that "once a child's credibility is called into question, proper expert testimony may be appropriate" under Evidence Rule 702(a). Id. More particularly, it was observed that

> because research generally accepted as scientifically reliable recognizes that child victims of sexual abuse may exhibit unexpected behavior patterns seemingly inconsistent with the claim of abuse, such evidence may be permissible under Indiana Evidence Rule 702(a)'s authorization of 'specialized knowledge [which] will assist the trier of fact to understand the evidence.'

Id. (quoting Evid. R. 702(a)).

In this case, Dr. Williams did not testify that there was any recognized syndrome or profile of child sexual abuse victims, much less that K.F. fit such a profile and had therefore been abused. In fact, Dr. Williams did not specifically testify about K.F. And just as important, the State did not present Dr. Williams's testimony to prove—even by implication or inference—that K.F. had been molested. Instead, the State offered Dr. Williams's testimony because K.F.'s credibility had been called into question. Indeed, Lyons repeatedly emphasized alleged inconsistencies in K.F.'s various statements regarding the abuse and a changing time pattern in the accusations. And Dr. Williams's testimony was presented to show the jury that things Lyons was using to attack K.F.'s credibility, were, in fact, not atypical of child sex abuse victims. In sum, this was a proper use of expert testimony in this realm. See Stout v. State, 612 N.E.2d 1076, 1080 (Ind. Ct. App. 1993) (recognizing that expert testimony that an individual's behavior is

consistent or inconsistent with that observed from other victims is a type of evidence that is admissible).

In our view, the requirements of Evidence Rule 702 were satisfied here, and we conclude that the admission of Dr. Williams's testimony did not constitute error, much less fundamental error.

The judgment of the trial court is affirmed.

ROBB, C.J., and BRADFORD, J., concur.