FILED

May 04 2018, 9:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Frederick Vaiana
Voyles Vaiana Lukemeyer Baldwin &
Webb
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Andre Taylor, a/k/a Robert Davidson, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | May 4, 2018 <br><br> Court of Appeals Case No. 49A04-1708-CR-1930 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable James Osborn, Judge <br><br> Trial Court Cause No. 49G02-1501-F2-1210 |

**Barnes, Judge.**

# Case Summary

Andre Taylor, a/k/a Robert Davidson,[1] appeals his convictions for Level 2 felony burglary, Level 3 felony armed robbery, two counts of Level 3 felony criminal confinement, and the finding that he is an habitual offender. We affirm in part, reverse in part, and remand.

# Issues

The issues before us are:

    I.    whether the trial court properly admitted evidence recovered from Taylor's cell phone; and

    II.    whether his multiple convictions violate double jeopardy principles.

# Facts

In the early morning hours of January 10, 2015, Victor Villalobos was at his home in Indianapolis packing items to send to his family in Mexico. Villalobos's housemate Julian Altatenco also was there. Villalobos and Altatenco heard loud banging on the front and back doors. Villalobos looked through a window onto his front porch and saw a man with a gun. At that

---

[1] When arrested, the appellant told police his name was "Robert Davidson," but police soon learned that his true name is Andre Taylor. He does not dispute this fact, although most of the filings in this case at trial and on appeal, including the CCS and appellate docket, have listed the appellant's primary name as "Robert Davidson." However, two weeks after the initial charging in this case, the trial court granted the State's motion to amend the charging information to list the name as Andre Taylor a/k/a Robert Davidson. In this opinion, we will use Taylor's undisputed legal name throughout.

point Villalobos attempted to call 911 but was unable to complete the call before two men broke in through the back door, two men broke in through the front door, and one of them took his cell phone. At least two of the men were armed with guns, and they all were wearing masks. Two of the men forced Villalobos into a bedroom, and the other two men forced Altatenco into another room. The men attempted to tie Villalobos's and Altatenco's hands with zip ties, repeatedly punched them both, and demanded money from Villalobos. At first, Villalobos said he had no money. However, after one of the men pointed a gun at Villalobos's head and threatened to kill him, Villalobos told them there was $150 on a table, which one of the men took.

[4] One of Villalobos's neighbors called 911 and reported several men breaking into his residence. Indianapolis Metropolitan Police Officers Kevin Larussa, Michael Beatty, and Shiela McNeal responded to the call. When arriving on the scene, Officer Larussa saw a masked man dressed in black looking at him from the front window of Villalobos's house. The officers then heard someone yell "police," followed by running in the house. Officers Larussa and Beatty ran into the front of the house and saw two black men, one dressed in gray and the other in black, running out the back door. The man in black managed to scale a fence and run away. After that, a shot was fired toward Officer Larussa. Officer Larussa turned toward where the shot came from and saw the man in gray pointing a gun at him. Officer Larussa returned fire multiple times and hit the man in the leg. When the officers arrested the man, he gave his name as Robert Davidson rather than his actual name, Andre Taylor. The other three

men involved in the burglary and robbery were Donte Jones, Dariel Dodd, and Quincy Stamps.

[5] Later that same day while searching the scene, officers found a cell phone in Villalobos's backyard, which was determined to belong to Jones. When Taylor was taken to the hospital for treatment of his gunshot wound, police seized his phone. A technician was able to determine that between January 8-10, 2015, there were thirty-six calls and six texts between these two phones. However, because there was a passcode lock on Taylor's phone, the technician was unable to access the content of any texts or data on the phone.

[6] A different technician, Detective Grant Melton, had received training in a method of acquiring data from a phone with a passcode that cannot be decoded. The technique, called "Chip-Off," involves first de-soldering and removing a phone's memory chip from the phone's circuit board, primarily by heating the board until the solder and epoxy connecting the chip to the board loosens. A technician can then place the memory chip into a standalone memory chip reader and retrieve the data from the chip. After performing the "Chip-Off" procedure on Taylor's phone, Detective Melton was able to read six text messages sent between Taylor and Jones between 9:55 and 10:05 p.m. on January 9, 2015. The texts were not highly revealing. Taylor first texted Jones, "You good bro," to which Jones responded, "Yup coming out n a min." Ex. 155. Taylor then wrote, "I think the boys out here," and Jones wrote, "Here I come." *Id.* Taylor replied, "K," followed several minutes later by "B***h come on." *Id.*

[7]     The State charged Taylor with Level 2 felony burglary, Level 3 felony armed robbery, two counts of Level 3 felony criminal confinement, Level 4 felony unlawful possession of a firearm by a serious violent felon, and Level 5 felony attempted battery with a deadly weapon. The State also alleged that Taylor was an habitual offender. Before trial, Taylor filed a motion in limine to exclude evidence related to Detective Melton's examination of his cell phone, asserting that the "Chip-Off" investigation method was not established as reliable. The trial court denied this motion.

[8]     A bifurcated jury trial was held on June 26-28, 2017. At the conclusion of the first part of trial, the jury found Taylor guilty of Level 2 felony burglary, Level 3 felony armed robbery, and two counts of Level 3 felony criminal confinement, but found him not guilty of attempted battery with a deadly weapon. Taylor then pled guilty to the habitual offender enhancement and, in exchange, the State dismissed the serious violent felon charge. The trial court entered judgments of convictions and sentences for all of the guilty findings and imposed an habitual offender sentence enhancement. Taylor now appeals.

## Analysis

### I. *Admission of Evidence*

[9]     Taylor first contends the trial court erred in allowing Detective Melton to testify as to what he was able to recover from Taylor's phone by using the "Chip-Off" forensic technique. We will reverse a conviction based on an evidentiary ruling only if there has been an abuse of discretion resulting in prejudicial error.

*Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). "A trial court abuses its discretion when its ruling is either clearly against the logic and effect of the facts and circumstances before the court, or when the court misinterprets the law." *Id.*

[10] Taylor specifically argues that Detective Melton failed to meet the standard for the admission of expert scientific testimony under Indiana Evidence Rule 702. That rule provides:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

In adopting this rule, our supreme court did not intend to interpose an unnecessarily burdensome procedure or methodology for trial courts to apply when considering the admissibility of expert testimony. *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 460 (Ind. 2001). Rather, the rule was meant "to liberalize, rather than to constrict, the admission of reliable scientific evidence." *Id.*

[11] The proponent of expert scientific testimony bears the burden of establishing the foundation and reliability of the scientific principles underpinning such

testimony pursuant to Evidence Rule 702(b). *Sciaraffa v. State*, 28 N.E.3d 351, 357 (Ind. Ct. App. 2015), *trans. denied*. Reliability may be established by judicial notice or by sufficient foundation to convince the court that the relevant scientific principles are reliable. *Id.* In determining reliability, courts may consider the following nonexclusive factors: (1) whether the technique has been or can be empirically tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error as well as the existence and maintenance of standards controlling the technique's operation; and (4) general acceptance within the relevant scientific community. *Barnhart v. State*, 15 N.E.3d 138, 144 (Ind. Ct. App. 2014).

[12] Here, Detective Melton testified regarding his extensive training in the field of cell phone forensics, which included 700 hours generally and forty hours specifically with respect to the "Chip-Off" technique. That technique has been in common use in the forensics community since 2014 or 2015 and has been the subject of empirical studies and peer review. The National Institute of Standards and Technology—part of the United States Department of Commerce—has established guidelines regarding use of the technique and other cell phone data recovery methods, as has an organization called the Scientific Working Group on Digital Evidence. Detective Melton has personally recovered data from approximately 800 cell phones and has used the "Chip-Off" method seventy-one times. He successfully recovered data on sixty-one of those occasions; the reasons he was not able to in the other ten cases were because the data was encrypted and "Chip-Off" cannot decrypt data or because

the chip was damaged during the process of de-soldering and removal from the phone. Detective Melton was unaware of any case in which "Chip-Off" could result in the alteration of data on a phone memory chip as opposed to damaging or deleting such data.

[13] Despite this evidence, Taylor claims Detective Melton's foundational testimony was too vague and conclusory with respect to the degree of scientific acceptance of the "Chip-Off" method and that he likewise could not provide details on peer review and publication regarding the method. However, Taylor's argument presupposes that Detective Melton was presenting "scientific" evidence. The "specialized knowledge" mentioned in Evidence Rule 702(a) includes more than just scientific knowledge, and if knowledge is not "scientific," it need not be proven reliable by means of "scientific principles" under Evidence Rule 702(b). *Lyons v. State*, 976 N.E.2d 137, 142 (Ind. Ct. App. 2012) (citing *Malinski v. State*, 794 N.E.2d 1071, 1084 (Ind. 2003)). "Rather, such evidence is governed only by the requirements of Rule 702(a), and any weaknesses or problems in the testimony go only to the weight of the testimony, not to its admissibility, and should be exposed through cross-examination and the presentation of contrary evidence." *Id.* (citing *Turner v. State*, 953 N.E.2d 1039, 1050 (Ind. 2011)).

[14] We agree with the State that Detective Melton's expertise and testimony was not "scientific" in nature. Rather, it would more correctly be called "technical" or "specialized" knowledge. This court has identified mechanical engineering as "technical," not "scientific," knowledge. *O'Banion v. Ford Motor Co.*, 43

N.E.3d 635, 643 (Ind. Ct. App. 2015), *trans. denied*. The processes by which Detective Melton can recover data from cell phones is more akin to engineering than science. Detective Melton was not testifying about the quantum physics principles behind smartphone technology.

[15] As another court has put it:

> Forensic investigation increasingly requires the use of computer software or other technological devices for the extraction of data. While an investigator must have specialized knowledge in the use of the particular software or device, it is not required—nor is it practical—for an investigator to have expertise in or knowledge about the underlying programming, mathematical formulas, or other innerworkings of the software.

*State v. Pratt*, 128 A.3d 883, 891-92 (Vt. 2015). In *Pratt*, similar to here, the defendant had challenged the admissibility of a forensic technician's recovery of data from the defendant's cell phone on the basis that the technician's testimony regarding the scientific reliability of the recovery method was too conclusory and that he lacked knowledge of such things as the error rate of the program he used to recover the data. The *Pratt* court rejected this argument, noting in part, "The forensic expert's testimony is not about basic scientific principles, and he is not drawing inferences from the facts. He merely is explaining how he extracted the data from the cell phone and how he read that data—specialized knowledge that he acquired through his training and experience." *Id.* at 893. We reach the same conclusion here regarding

Detective Melton's testimony. The trial court did not abuse its discretion in admitting this evidence.

[16] Furthermore, even if the evidence Detective Melton presented related to the "Chip-Off" method was erroneously admitted, any such error was harmless. In assessing whether an evidentiary error prejudiced a defendant, we consider the probable impact of the evidence on the jury in light of all the other properly-presented evidence. *Williams*, 43 N.E.3d at 581. "If the conviction is properly supported by other independent evidence of guilt, the error is harmless." *Id.*

[17] The most compelling evidence against Taylor was his apprehension in Villalobos's backyard immediately after the burglary and robbery, when he was shot by Officer Larussa after first shooting at the officer. The fact that there was ongoing, frequent communication between Taylor's phone and Jones's phone was established by evidence other than that acquired by the "Chip-Off" method. The "Chip-Off" method did reveal the contents of several texts between Taylor and Jones a few hours before the burglary, but there is no mention of any criminal activity in those texts. In sum, the additional evidence Detective Melton said he recovered from Taylor's phone was not very impactful in light of all the other evidence in this case and would have been harmless if it were erroneously admitted.

## II. Double Jeopardy

[18] Taylor also contends that his convictions for Level 3 felony armed robbery and two counts of Level 3 felony criminal confinement must be vacated because of

double jeopardy concerns and that only his conviction for Level 2 felony burglary may stand. Article 1, Section 14 of the Indiana Constitution provides, "No person shall be put in jeopardy twice for the same offense." Two or more offenses are the "same offense" in violation of the Indiana Double Jeopardy Clause if, "'with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense.'" *Sistrunk v. State*, 36 N.E.3d 1051, 1053 (Ind. 2015) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)). The *Richardson* "actual evidence" test is not violated if the evidentiary facts used to establish the essential elements of one offense establish only one or even several, but not all, of the essential elements of a second offense. *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002).

[19] In addition to the constitutional test prescribed by *Richardson*, Indiana courts adhere to rules of statutory construction and common law that prohibit multiple convictions, as delineated in Justice Sullivan's concurring opinion in *Richardson*. *Sistrunk*, 36 N.E.3d at 1053-54. One of those rules prohibits "[c]onviction and punishment for a crime which consists of the very same act as an element of another crime for which the defendant has been convicted and punished." *Richardson*, 717 N.E.2d at 55 (Sullivan, J., concurring). An example of that rule's application is *Wethington v. State*, 560 N.E.2d 496, 508 (Ind. 1990), in which our supreme court vacated a confinement conviction

because the confinement was coextensive with the behavior or harm necessary to establish an element of the defendant's robbery conviction. *Id.*

[20] Taylor first argues that he cannot be convicted of both burglary and robbery, the underlying felony he intended to commit when he broke and entered into Villalobos's home. However, Indiana courts have consistently held that double jeopardy principles do not prohibit convictions for both burglary and the felony the defendant intended to commit when breaking and entering. "[T]he criminal transgression of burglary is committed by a person intending to commit an underlying felony at the moment the building or structure is broken into and entered. The person's culpability is established at the point of entry regardless of whether the underlying intended felony is ever completed." *Swaynie v. State*, 762 N.E.2d 112, 114 (Ind. 2002). *See also Lee v. State*, 892 N.E.2d 1231, 1236-37 (Ind. 2008) (holding convictions for both burglary and attempted armed robbery did not constitute double jeopardy); *Pierce v. State*, 761 N.E.2d 826, 830 (Ind. 2002) ("The taking of money supports the robbery and the breaking and entering supports the burglary, but neither is an element of the other crime."); *Bunch v. State*, 937 N.E.2d 839, 846 (Ind. Ct. App. 2010) (affirming convictions for both burglary and robbery "[b]ecause the burglary was complete before the robbery began"), *trans. denied*. Under this clear precedent, we find no double

jeopardy concern with Taylor's convictions for both Level 2 felony burglary and Level 3 felony armed robbery.[2]

[21] With respect to Taylor's convictions for criminal confinement, we do agree that they must be vacated. As noted, a confinement conviction may not stand if a defendant was convicted of a second offense that inherently required confinement of the victim and the confinement was no more extensive than necessary to carry out the other offense. *Wethington*, 560 N.E.2d at 508. *See also Vanzandt v. State*, 731 N.E.2d 450, 455 (Ind. Ct. App. 2000) (vacating confinement conviction where defendant also was convicted of robbery, which was effected by ordering victims to lie on floor and pointing a gun at them while taking money and obtaining access to getaway vehicle), *trans. denied*. Convictions for both confinement and a second offense, such as robbery, may both stand if there is evidence that confinement of a victim continued after a robbery was completed. *See Merriweather v. State*, 778 N.E.2d 449, 455-56 (Ind. Ct. App. 2002) (affirming convictions for both robbery and confinement where defendant ordered victim to empty cash registers, then continued holding her at gunpoint and ordered her to go to store manager's office).

[22] Here, we see no reasonable basis upon which to conclude that the confinement of Villalobos and Altatenco was any more extensive than necessary to carry out

---

[2] We also note that the elevation of both Taylor's burglary and robbery convictions to higher levels of felonies based on the use of the same weapon presents no double jeopardy problem. *See Miller v. State*, 790 N.E.2d 437, 439 (Ind. 2003).

the robbery. As testified to by Villalobos and Altatenco, immediately after Taylor and his cohorts broke into the house, they forced them into separate rooms at gunpoint, put zip ties around their wrists, and then began beating them up. It was while Villalobos was being beaten that one of the men demanded money from him. When Villalobos at first said he had no money, one of the men pointed a gun at his head and threatened to kill him if he had no money. Villalobos then told them about the $150, which one of them took. Villalobos could not recall how long the incident took because "[e]verything happened so fast." Tr. Vol. II p. 116. He also said that the beating and confinement in the bedroom only ended when police arrived on the scene.

[23] Given this evidence, it is apparent that the confinement of both Villalobos and Altatenco was part and parcel of how Taylor and his cohorts accomplished the robbery. There was no evidence of any separate or significant length of confinement after the robbery was completed. And, this was not a protracted incident. As such, we conclude that Taylor's two convictions for Level 3 felony confinement must be vacated.

## Conclusion

[24] The trial court properly allowed Detective Melton to testify about evidence he recovered from Taylor's phone by using the "Chip-Off" forensic technique; in any event, that evidence would have been harmless if it was erroneously admitted. Although Taylor's convictions for Level 2 felony burglary and Level 3 felony robbery do not violate double jeopardy principles, those principles

require that we reverse and remand for the trial court to vacate his convictions for Level 3 felony confinement.

[25]     Affirmed in part, reversed in part, and remanded.


Vaidik, C.J., and Pyle, J., concur.