## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Mark K. Leeman
Leeman Law Office and
Pulaski County Public Defender
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Richard Brown,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | July 29, 2019<br><br>Court of Appeals Case No.<br>18A-CR-2545<br><br>Appeal from the Pulaski Circuit Court<br><br>The Honorable Michael A. Shurn, Judge<br><br>Trial Court Cause No.<br>66C01-1610-F4-8 |

**Brown, Judge.**

[1] Richard Brown appeals his convictions for dealing in a narcotic drug as level 4 felonies. He raises one issue which we revise and restate as whether the trial court abused its discretion in admitting certain evidence. We affirm.

## Facts and Procedural History

[2] On two days in 2016, April 29th and May 27th, Brown sold Oxymorphone to D.R. (the "CI"), who was working as a confidential informant for the Indiana State Police. The CI used a "key fob for audio and video" to record the transactions. Transcript Volume 2 at 185.

[3] On October 27, 2016, the State charged Brown with two counts of dealing in a narcotic drug as level 4 felonies and two counts of possession of a narcotic drug as level 6 felonies. At Brown's jury trial, the State presented the testimony of the CI, law enforcement who worked with the CI, and Indiana State Police Sergeant Jeremy Chapman, who was an audio-visual technician in the cybercrime unit. Following the presentation of the CI's testimony and a recess, the court noted that the State wished to introduce an audio recording and the testimony of the officer who attempted to enhance the sound on that recording. Brown's counsel indicated the State had produced an exhibit that was the result of the application of a filter to an audio recording and argued that the process of applying the filter was an unreliable process, not peer reviewed, and not based on sound scientific principles and that the witness cannot explain the scientific principles upon which the procedure was based. The prosecutor stated that, in addition to scientific knowledge, a person can qualify as an expert based upon technical skills or specialized knowledge. He argued that the individual had

been working with video and audio enhancements for the last five years, that this is a technical application of regularly accepted software used in the industry, and that, like with a breathalyzer, he did not have to understand the scientific principles behind how it works but did have to understand how to perform and use it which is what his testimony would establish.

[4] Sergeant Chapman testified as to his training and work in digital forensics and audio-visual enhancement. He testified that he used Adobe Audition and filters purchased separately from Salient Sciences as a plug-in for the software. When asked what steps he took to become familiar with the software, he testified that he attended a vendor-based forty-hour class covering how to employ the filters. When asked how the filters work in general, he testified "[y]ou insert the - you import the original video file, and then you can apply the filters to compensate for - to employ them against noises or outline things in - within the audio to try and reduce things to make what you're after sound better," and when asked "[a]nd sounding better is judged," he said "[s]ubjectively by whether or not you can hear it or not hear it." Transcript Volume III at 57. He testified the software allowed him "to reduce specific frequencies around other frequencies." *Id*. at 58. When asked "you're not taking words out," he replied "[r]ight." *Id*. at 59. He stated "[s]o if I'm editing this file it's going to be changed, but hopefully I'm eliminating it in a way that changes it so it's better to be heard . . . [o]r certain portions are better to be heard." *Id*. He testified that, within Audition, he used a dropdown menu to apply two filters, a high-pass filter designed primarily to reduce low frequencies such as a rumble, an engine noise,

or other low, non-conversational sound, and an inverse filter addressing sounds outside of the loudest portions such as a conversation. He indicated that, by applying the filters, words become clearer because other noise is removed. He indicated that he had not gone to school to learn the scientific principles behind the equipment and that his job was to learn the software which is used in the industry and to apply and use it correctly to enhance quality. The State introduced exhibits of recordings related to the April 29th buy.

[5] On cross-examination, when asked if he was familiar with the scientific principles behind the filter process, Sergeant Chapman testified "I'm not familiar," "I understand how and what the software is doing," and "I don't know the algorithms and stuff used to develop, and the means behind the software development." *Id*. at 70. When asked in how many cases he had applied filters to audio, he replied "[s]ix to a dozen" but did not have a count, and he indicated he had not previously testified in court regarding the use of the filters. *Id*. at 71. When asked "although you listened to the first one you didn't actually listen all the way through to the second one after you applied the filters," he replied "I've listened to both of them in different lengths and different variations" and "I didn't need to know the whole conversation, I just wanted to make it sound better." *Id*. at 73. When asked "the problem is that when you cut into some, that you might cut into the conversation," he replied "[t]here's the potential, yes" and testified "[w]herever that - where the sounds lays in the frequency. If you dip into that frequency you're going to remove the sound from the vowels and consonants of the conversation, perhaps." *Id*.

When asked "[y]ou can't say for sure, and how much of the conversation that's on this audio was affected by the filters that you applied," he answered "[e]xactly, yeah." *Id*. at 74. On redirect, when asked "[c]an you say that even applying the filters you do not remove, or add any of the words that are in the conversations," Sergeant Chapman answered "[c]orrect," and when asked "the whole purposes of applying this, is to assist the people who have to listen to it, so that they can hear it better," he again replied affirmatively. *Id*. at 83. On recross-examination, when asked "you didn't alter the words and replace one with the other, but you took out the sounds that formed the words, sometimes," Sergeant Chapman replied "[t]he potential is always there. But . . . I try to reduce it so that the application falls below the range of auditory. Because you don't want to remove auditory, because that just makes it sound worse" and "I want to make it sound better, so I stayed - I tried to stay away from dipping into the consonants and the vowels." *Id*. at 84-85. When asked "[b]ut you may have dipped into the consonants and the vowels," he replied "[i]t may have, but not enough to change the work." *Id*. at 85.

[6] In the presence of the jury, the prosecutor elicited testimony from Sergeant Chapman regarding his work as an audio-visual technician, the process of applying filters to audio recordings and the software he used, and the audio recording to which he applied two filters. Brown asked to approach, and the court stated in part "[h]e is a technician," "he is not an expert on sound," "[h]e's simply qualified as the person who knows how to run it," and "he's certainly qualified to run the machine and deal with the spectrums of sound."

*Id.* at 109.  The State later moved to admit the recording to which the filters had been applied, and Brown objected and argued that "the scientific procedure that was used to enhance those is not a valid procedure under Indiana law."  *Id.* at 192.  The court admitted the recording.  The jury found Brown guilty as charged.  The court vacated the possession counts and sentenced him to concurrent sentences of seven years including two years on home detention on his dealing convictions.

## *Discussion*

[7]   The admission of evidence falls within the sound discretion of the trial court.  *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002).  An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented.  *Oatts v. State*, 899 N.E.2d 714, 719 (Ind. Ct. App. 2009).  We will not reverse an error in the admission of evidence if the error was harmless.  *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011).

[8]   Brown argues that the process used by Sergeant Chapman is unreliable and cites Ind. Evidence Rule 702(b).  He argues that Sergeant Chapman had used the process only six to twelve times, admitted the process could affect some of the conversational portions of the recording, and did not review the entire recording following application of the filters.  He asserts that Sergeant Chapman's "process was pseudoscience conjecture."  Appellant's Brief at 14.  He argues Sergeant Chapman could not explain the scientific process behind the filters.  The State maintains that the court did not abuse its discretion in admitting the recording and that Evidence Rule 702(b) is inapplicable.  It argues

that, similar to the detective in *Taylor v. State*, 101 N.E.3d 865 (Ind. Ct. App. 2018), *reh'g denied*, Sergeant Chapman applied technical expertise and training and did not apply scientific principles. It further argues that any error in admitting the challenged recording was harmless. In reply, Brown argues that the detective in *Taylor* merely extracted data whereas Sergeant Chapman used a complex system to alter an audio recording. He also argues that an average juror would likely be swayed by the recording.

[9] Ind. Evidence Rule 702 provides:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

In adopting the rule, the Indiana Supreme Court did not intend to interpose an unnecessarily burdensome procedure for trial courts to apply when considering the admissibility of expert testimony. *Taylor*, 101 N.E.3d at 870 (citing *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 460 (Ind. 2001)). "Rather, the rule was meant 'to liberalize, rather than to constrict, the admission of reliable scientific evidence.'" *Id.* (citing *Sears Roebuck*, 742 N.E.2d at 460).

[10] In *Taylor*, we observed that the "specialized knowledge" mentioned in Evidence Rule 702(a) includes more than just scientific knowledge, and if knowledge is

not "scientific," it need not be proven reliable by means of "scientific principles" under Evidence Rule 702(b). *Id.* at 871 (citing *Lyons v. State*, 976 N.E.2d 137, 142 (Ind. Ct. App. 2012) (citing *Malinski v. State*, 794 N.E.2d 1071, 1084 (Ind. 2003))). "Rather, such evidence is governed only by the requirements of Rule 702(a), and any weaknesses or problems in the testimony go only to the weight of the testimony, not to its admissibility, and should be exposed through cross-examination and the presentation of contrary evidence." *Id.* (citing *Lyons*, 976 N.E.2d at 142 (citing *Turner v. State*, 953 N.E.2d 1039, 1050 (Ind. 2011))).

[11]     The detective in *Taylor* testified regarding his training in cell phone forensics which included forty hours with respect to a "Chip-Off" technique, a cell phone data recovery method which had been in common use since 2014 or 2015, had been the subject of empirical studies and peer review, and for which guidelines had been established by a part of the Department of Commerce. *Id.* at 870. The technique involved de-soldering and removing a phone's memory chip from the phone's circuit board, primarily by heating the board until the solder and epoxy connecting the chip to the board loosened, and then placing the memory chip into a standalone memory chip reader and retrieving the data from the chip. *Id.* at 869. The detective had used the method seventy-one times and successfully recovered data on sixty-one of those occasions, and he was unaware of any case in which the method could result in the alteration of data as opposed to damaging or deleting the data. *Id.* at 870-871.

[12]     Taylor argued that the detective's testimony was too vague and conclusory with respect to the degree of scientific acceptance of the method and that he could not provide details on peer review and publication regarding the method. *Id*. at 871. We observed that Taylor's argument presupposed that the detective was presenting "scientific" evidence. *Id*. We held:

> We agree with the State that [the detective's] expertise and testimony was not "scientific" in nature. Rather, it would more correctly be called "technical" or "specialized" knowledge. This court has identified mechanical engineering as "technical," not "scientific," knowledge. *O'Banion v. Ford Motor Co.*, 43 N.E.3d 635, 643 (Ind. Ct. App. 2015), *trans. denied*. The processes by which [the detective] can recover data from cell phones is more akin to engineering than science. [The detective] was not testifying about the quantum physics principles behind smartphone technology.
>
> As another court has put it:
>
>> Forensic investigation increasingly requires the use of computer software or other technological devices for the extraction of data. While an investigator must have specialized knowledge in the use of the particular software or device, it is not required—nor is it practical—for an investigator to have expertise in or knowledge about the underlying programming, mathematical formulas, or other innerworkings of the software.
>
> *State v. Pratt*, 200 Vt. 64, 128 A.3d 883, 891-892 (2015). In *Pratt*, similar to here, the defendant had challenged the admissibility of a forensic technician's recovery of data from the defendant's cell phone on the basis that the technician's testimony regarding the scientific reliability of the recovery method was too conclusory and that he lacked knowledge of such things as the error rate of the program he used to recover the data. The *Pratt* court rejected

this argument, noting in part, "The forensic expert's testimony is not about basic scientific principles, and he is not drawing inferences from the facts. He merely is explaining how he extracted the data from the cell phone and how he read that data—specialized knowledge that he acquired through his training and experience." *Id.* at 893. We reach the same conclusion here regarding [the detective's] testimony. The trial court did not abuse its discretion in admitting this evidence.

*Id.*

[13] Sergeant Chapman testified regarding his training in audio forensics, his familiarity with the software he used, and the steps he took to apply two filters to reduce noise or sounds so that the recorded conversation was easier to hear. He testified that he did not eliminate any words from the recordings. He also stated that, although he had not learned the scientific principles behind the equipment and did not "know the algorithms . . . used to develop . . . the software," he understood "what the software is doing" and that his job was to understand the software used in his industry and to use it correctly. Transcript Volume III at 70. Sergeant Chapman's expertise and testimony may be characterized as technical or specialized knowledge. While he may not have had knowledge of the underlying programming or innerworkings of the software, he had been trained and knew how to use the software. He did not draw inferences from facts, but used his specialized knowledge acquired through his training and experience to use software to filter noise and other sounds from an audio recording so that the voices could be heard more clearly. We find that any error in admission of the challenged evidence is harmless.

Errors in the admission of evidence are to be disregarded as harmless error unless they affect the substantial rights of the party. *Lewis v. State*, 34 N.E.3d 240, 248 (Ind. 2015). To determine whether an error in the introduction of evidence affected the party's substantial rights, we assess the probable impact of that evidence upon the jury. *Id.* The jury in this case heard extensive testimony from the CI and law enforcement who assisted with the controlled buys. The jury heard testimony from a number of officers regarding their participation in monitoring the controlled buys including providing and recording the buy money, searching the CI to ensure that he did not have any illegal substances prior to the buys, setting up surveillance to follow the CI, and retrieving purchased pills from the CI. We cannot say that the introduction of the challenged evidence affected Brown's substantial rights. *See Johnson v. State*, 699 N.E.2d 746, 749 (Ind. Ct. App. 1998) (holding that the error in admitting a recording was harmless as it was cumulative of prior testimony).

For the foregoing reasons, we affirm Brown's convictions.

Affirmed.

May, J., and Mathias, J., concur.